## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

LEVON HELM STUDIOS, INC.

     Plaintiff,

v.

AMY HELM, GEORGE GILBERT, ESQ., FRANCIS FLYNN, CPA, THE HELM FAMILY MIDNIGHT RAMBLE LLC, LORI PETERS, SHARON FLETCHER, ESQ., CHRISTY NEWMAN, AND JENN VAN STEENBURG

     Defendants.

Case No.:  1:26-cv-1540 (MAD/PJE)

## COMPLAINT

Plaintiff Levon Helm Studios, Inc. ("Plaintiff" or "LHS") alleges in support of its Complaint against Defendants Amy Helm, George Gilbert, Esq. Francis Flynn, CPA, The Helm Family Midnight Ramble LLC, Lori Peters, Sharon Fletcher, Esq., Christy Newman, and Jenn Van Steenburg, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

## INTRODUCTION

1.    In January 2004, Mark Lavon Helm ("Levon"), a GRAMMY award-winning multi-instrumentalist who is best known as a member of the musical group collectively and professionally known as "The Band," began organizing a concert series under the name "Midnight Ramble" in an attempt to stave off foreclosure proceedings that threatened to force Levon and his wife Sandra Helm ("Sandy") from their longtime home in Woodstock, New York. The Midnight Ramble concerts, held in a recording studio on the property known as "The Barn," were a runaway success, and in October 2004 Levon

incorporated LHS in New York as a 51% owner, along with fellow stockholders Norman Clancy ("Norman"), Barbara O'Brien ("Barbara"), and Brian Parillo ("Brian").

2. LHS continued to operate the Midnight Ramble concert series on an ongoing basis before officially registering the service mark "Midnight Ramble" with the United States Patent and Trademark Office ("USPTO") in June 2011 (the "Original Mark"). Levon continued to participate in the Midnight Ramble concert series until his untimely death in April 2012, and LHS has maintained the mark continuously since registering it.

3. This is an action for infringement and contributory infringement of LHS' federally registered service mark "Midnight Ramble" under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114, and for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Defendants Amy Helm ("Amy" or "Amy Helm"), George Gilbert, Esq. ("Gilbert" or "Attorney Gilbert"), Francis Flynn, CPA ("Flynn" or "CPA Flynn"), The Helm Family Midnight Ramble LLC ("THFMR"), and Lori Peters ("Peters") (collectively, the "Trademark Defendants"). Plaintiff also makes claims pursuant to the statutory and common laws of the State of New York related to the Trademark Defendants' infringement upon the "Midnight Ramble" service mark, and for conspiracy to violate the Lanham Act pursuant to the common law of the State of New York.

4. Shockingly, at the time Amy, Attorney Gilbert, and CPA Flynn began conspiring to infringe on LHS' Original Mark, Amy was the President and a 40% stockholder of LHS, Attorney Gilbert was working for LHS as its outside counsel, and CPA Flynn had been LHS' accountant for nearly twenty years. Each participant in this scheme was legally obligated to work on behalf of LHS' best interests, yet each of them chose

2

personal gain over their duties to LHS. LHS did not authorize anyone to use either "Midnight Ramble" or perform under an infringing mark.

5. Within months, Attorney Gilbert formed THFMR at Amy's request. Amy, its sole member, would receive all income generated from infringing on "Midnight Ramble." Shortly thereafter, Attorney Gilbert filed a service mark application on behalf of THFMR with the USPTO to register "The Helm Family Midnight Ramble" (the "Infringing Mark"). Even though the USPTO rejected the Infringing Mark based on the risk of confusion with the Original Mark held by LHS, Amy continued to tour and profit from using the Infringing Mark with the assistance of her agent, Peters. Amy continued to tour and profit from using the Infringing Mark even after two separate attorneys with knowledge that she was infringing on LHS' Original Mark told her to stop.

6. Even more shockingly, Amy, Attorney Gilbert, and CPA Flynn documented their plans to divert money earned through Amy's use of the Infringing Mark away from LHS and into THFMR in a series of emails exchanged[1] between July and October 2023. Amy, Attorney Gilbert, and CPA Flynn confirmed—in writing—that they intended to divert Amy's income from performing under the Infringing Mark from LHS to a company solely owned by Amy and for her personal benefit, that they created THFMR to conceal the diversion from other LHS stockholders, and that Amy would be in direct competition with LHS if she did so.

7. Amy, Attorney Gilbert, and CPA Flynn, as officers, agents, and trusted advisors of LHS, each owed duties of good faith, care, and loyalty to LHS and its three other stockholders. As their violation of federal and state trademark law also breached

---

[1] Copies of this email correspondence is annexed hereto as Exhibits D and E, and discussed in more detail in paragraphs forty-nine through fifty-six.

3

their respective duties to LHS and its other stockholders, LHS additionally brings actions against them for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty pursuant to the statutory and common laws of the State of New York.

8.    Following a change in management at LHS on May 26, 2026 that revealed details about the Infringing Mark and how Amy, Attorney Gilbert, and CPA Flynn breached their duties to LHS, the remaining LHS stockholders also gained full access to the company's books and records for the first time in years, as well as access to email accounts given to LHS employees for LHS business. Prior attempts to gain access to the books and records were stymied by Amy, Attorney Gilbert, CPA Flynn, and other agents and employees at LHS working on their behalf. What the stockholders found in those records was heartbreaking.

9.    In response to the change in management at LHS and in an attempt to reverse it, Amy and another LHS employee went to Sandy's home on May 28, 2026. Over the next several hours, Amy spent hours berating her, demanding that she withdraw support from the change in management and terminate her personal counsel and new counsel for LHS, and refused to leave until she did so. Amy went as far as to dictate and then proofread the emails she demanded that Sandy send to her personal counsel and to LHS' attorneys. The multi-hour confrontation was captured on a video camera positioned directly above the bench where Sandy, a woman in her mid-seventies, had to sit for hours without leaving for food, water, or to use the bathroom.[2] The following day, Amy returned to Sandy's home with what Amy described as an operating agreement, demanding that Sandy sign it and threatening to cause employees to quit from LHS and to cancel

---

[2] Copies of stills captured from the video surveillance footage are annexed hereto as Exhibit W.

upcoming shows if she did not. Upon information and belief, Attorney Gilbert prepared the operating agreement at Amy's request, which would have transferred Sandy's LHS shares to a company Amy controlled because, as she told Sandy at the time, "[t]his can never happen again." Sandy refused to go along, however, and shortly thereafter transferred the voting rights in her LHS shares to Brian so that she would not be subject to any further attempts at coercion by Amy. Sandy retains the economic value of her LHS shares, and supports the company's ongoing investigation into its finances.

10.   LHS' investigation thus far has determined that, after stockholders appointed Amy as President of LHS on April 18, 2017, company finances deteriorated. While LHS' earnings and losses were modest when stockholder Barbara kept diligent control of costs, that diligence disappeared under Amy's leadership. Increased income was more than offset by increased spending by the company, and by the end of 2021[3] LHS was losing hundreds of thousands of dollars per year. Between 2012 and 2017 when Amy took over as President of LHS, the company operated on a small, yearly average loss of approximately $4,400. LHS was not profitable, but it was in no danger of closing. After Amy took over as President, LHS' yearly average losses, excluding SBA grants, increased to approximately $186,000 per year, putting LHS in grave financial jeopardy.

11.   By way of example, at the end of 2017, LHS recorded a small loss of approximately $14,000, after earning approximately $120,000 in gross profits against approximately $134,000 in expenses. By the end of 2022, LHS recorded an approximately $308,000 loss—more than twenty times what it lost the first year Amy took over as

---

[3] While LHS reported its most "profitable" year ever in 2021, this was due solely to receiving hundreds of thousands of dollars in Shuttered Venue Operator Grants from the Small Business Administration. Excluding these grants from LHS' balance sheet, LHS lost approximately twice as much money in 2021 as it did in 2020: during the height of New York's COVID-19 closures.

President—after earning approximately $344,000 in gross profits against approximately $652,000 in expenses. LHS was now losing money much faster than it was earning it, but why?

12.    The answer, unfortunately, was Amy. While LHS' new management continues its review of the LHS books and records kept by LHS while Amy was President, this review has so far uncovered millions of dollars of self-dealing transactions apparently authorized by Amy, or for her benefit, that were not disclosed to , or otherwise approved by, any disinterested stockholder or director of LHS, as required by New York law. Between 2018 and 2026 when LHS stockholders removed Amy as President, these transactions include, but are not limited to:

    a.  Over $400,000 in various financial transactions charged by Amy to LHS with no apparent LHS business purpose, including, but not limited to cash withdrawals, credit card expenses related to her personal touring such as gas, meals, and hotels, the rent on her home, her personal tax repayments, her health and life insurance, her driver, her personal lawyer's fees, the lease on her touring van, and personal loans and loans obtained for her other companies. This included Amy's withdrawal of a $10,000 loan from the SBA to LHS at the beginning of the COVID-19 shutdowns for no apparent business purpose, and which CPA Flynn later categorized only as "Due from Amy." Amy also forced LHS to repay an SBA loan she took out on behalf of and for the benefit of her personal touring company. Of the over $400,000 in charges that Amy billed to LHS for no apparent business purposes, approximately $167,000 of those charges were apparently so unrelated to the company that not even CPA Flynn could justify them as legitimate

expenses, all of which remain outstanding and categorized as "Due from Amy;"

b.  Nearly $200,000 in "loans" obtained from the Estate of Levon Helm (the "Estate") and businesses related to the Estate, apparently without notifying the Estate. Approximately half of these loans were from Dirt Farmer Music LLC ("Dirt Farmer"), a company set up to distribute royalty payments from Levon's last two  studio albums ("Dirt Farmer" and "Electric Dirt") and a live album ("Ramble at the Ryman") to the various musicians who helped record them. As a result of money being improperly transferred from Dirt Farmer to LHS, Dirt Farmer had no money to distribute royalties for approximately four years. Within thirty days of becoming President of LHS, Brian identified this issue and returned over $35,000 taken from Dirt Farmer to the Estate;

c.  Approximately $1.3 million in salaries paid to Amy and three other employees working in the LHS office, most of which was paid to Amy and two of the employees because Amy did not hire the third employee until approximately 2023. While LHS employee pay went up substantially while Amy was President, a large portion of total salary payments went to Amy and the three office employees (who LHS later determined spent most of their workday working for Amy and her own companies, while being paid by LHS for full time work); and

d.  Retaining her personal talent management company to perform venue management services for LHS, resulting in hundreds of thousands of dollars

7

in payments from LHS to the talent management company on, upon information and belief non-market terms that benefited Amy personally.

13.    While LHS continues to review the financial records it obtained after the management change, LHS estimates, based on the above identified losses, that it has incurred at least $2 million in damages as a result of Amy's various fiduciary duties to LHS, and reserves the right to revise its damages estimate as it continues to obtain and review additional financial records. The costs to LHS from Amy's personal expenses, excessive personal and administrative salaries, and self-dealing transactions played a major role in LHS' financial losses while Amy was President.

14.    LHS did not initially understand why salaries increased so dramatically while Amy was President, and in particular to her and three other office employees. The Barn is a 250-person venue that generally performs between six and eight shows per month, which would not justify such high administrative costs.

15.    Review of these employees' business emails sent through their work email addresses confirmed that, while they did in fact work part time for LHS, they would actively conduct personal business for Amy and companies she owned/was affiliated with, from their LHS business emails and while being paid by LHS to work for LHS. Upon information and belief, Amy paid these employees through LHS as full time LHS employees, while they spent the bulk of their working hours working for or on behalf of Amy on matters unrelated to LHS. Two of these employees resigned days after LHS stockholders removed Amy as President, and on their way out shredded a large number of paper records and attempted to delete thousands of emails from their work email accounts discussing their work for Amy and her own companies while they were being paid to work for LHS.

16. LHS is unable to review Amy's business correspondence from her work email address at this time, because she never activated or logged into the account while President of LHS, choosing instead to do business solely from her personal email.

17. LHS has also been damaged by Amy's choice to publicize her dispute with LHS and, upon information and belief, solicit or encourage artists and vendors to cancel contracts with LHS, thereby requiring LHS to issue refunds for tickets sold for the cancelled shows. Amy, as LHS' recent President, has actual knowledge of the financial harm this has done and will continue to do to LHS, because she is aware that the company, under her leadership, spent much of the money the company received for tickets to upcoming shows. Upon information and belief, LHS believes that Amy is leading or encouraging show cancellations in hope that LHS will either run out of money, or be so focused on repaying ticketholders that it is unable to pay to continue its investigation into Amy and her co-conspirators or pursue them for damages in court.

18. In addition to Attorney Gilbert, Amy also relied upon the services of Defendant Sharon Fletcher, Esq. ("Fletcher" or "Attorney Fletcher") to breach Amy's fiduciary duties to LHS and its stockholders. While Attorney Fletcher claimed to only represent Sandy as counsel for the Estate, LHS has obtained documents confirming that Attorney Fletcher and at least one other attorney associated with her office held themselves out as attorneys for LHS and negotiated agreements on its behalf. LHS is also aware that, in November 2012, Attorney Fletcher, along with CPA Flynn began counseling Sandy on allowing LHS to repurchase the LHS shares she stood to inherit from the Estate, and that Attorney Fletcher documented that, prior to a stockholder meeting in 2017, she discussed and recommended certain actions Sandy could take as an LHS stockholder that Attorney Fletcher likely also discussed with Amy because a number of those

recommendations were consistent with actions that Amy supported and Sandy vehemently opposed, including, but not limited to, dissolving LHS entirely,[4] a proposal Amy continuously put forward to Sandy beginning shortly after Levon's untimely death, with the enthusiastic support of Attorney Fletcher and other attorneys in her office, Attorney Gilbert, and CPA Flynn.[5] LHS is not aware of any conflict waivers signed by any disinterested stockholder or director of LHS that would permit Attorney Fletcher to represent LHS, while also advising Sandy and, upon information and belief, Amy, on actions they could take as LHS stockholders.

19.    LHS' review of the accounting records prepared and maintained by CPA Flynn also demonstrated that he failed to use generally accepted auditing and accounting principles. He failed to report Amy's questionable financial transactions to the other stockholders at LHS, deleted entries from LHS' general ledger, failed to track and account for unearned revenue, and allowed money for other accounts that he provided accounting services for, like the Estate and its related entities, to flow into and out of LHS for no apparent business purposes. CPA Flynn also frequently accounted for income and expenses in questionable entries that make it difficult for LHS to review the company transactions, determine the basis for those transactions, and ensure that CPA Flynn properly accounted for them. LHS believes, upon information and belief, that these questionable entries and practices were designed to conceal unauthorized transactions and the extent of LHS' losses while Amy was president.

---

[4] A copy of the April 2017 stockholder minutes discussing this is annexed hereto as Exhibit K, and discussed in more detail in paragraph sixty-eight.

[5] Copies of various emails discussing the various Defendants' scheme to devalue and dissolve LHS are annexed hereto as Exhibits L, M, and P, among others.

20.    As LHS discovered these claims while investigating its federal and state trademark claims against certain Defendants, and given their relationship to the federal and state trademark claims, LHS additionally brings actions against the Defendants for these additional breaches of fiduciary duty, aiding and abetting those breaches of fiduciary duty, conspiracy to breach fiduciary duty, accounting malpractice, and for faithless servant pursuant to the statutory and common laws of the State of New York.

21.    Plaintiff seeks injunctive and monetary relief.

## JURISDICTION

22.    The Court has jurisdiction over this action under 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a) and (b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

## VENUE

23.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is also proper in this district under 28 U.S.C. § 1391(b)(3), in that, upon information and belief, all Defendants other than Defendant Lori Peters are subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

## PARTIES

24.    Plaintiff Levon Helm Studios, Inc. is a domestic business corporation that is incorporated in the State of New York and with a principal place of business in Woodstock, New York. LHS was incorporated in October 2004, following the success of the Midnight Ramble performances that began earlier that year. Levon was the majority stockholder, followed by Norman, who had provided financing to start the Midnight

Rambles, Brian, Levon's friend and the person who both first suggested the idea of the Midnight Rambles at The Barn to him and who helped put on the original shows, and Barbara, Levon's manager. Levon later purchased Norman's interest in 2008 following a dispute between Norman and Amy about Amy's request for a 50% ownership interest in LHS, a request her father rebuffed when he pointedly declined to grant Amy any equity in LHS during his lifetime. LHS is aware that, to date,  Brian and Barbara have never received any distributions or dividends with respect to their LHS shares, and neither Brian nor Barbara have received any salaries or wages for rendering services to LHS as directors, officers, or employees. Following Levon's death in April 2012, his 80% interest in LHS passed equally to Sandy and Amy. LHS has used the "Midnight Ramble" mark consistently since January 2004, and has held a service mark for it issued through the USPTO since June 2011.

25.     Defendant Amy Helm is an individual who, upon information and belief, resides in Woodstock, New York, and is a citizen of the State of New York. Amy is Levon's daughter with Elizabeth "Libby" Titus, and Sandy became her stepmother in September 1981 when Levon and Sandy married. While Amy would perform at some Midnight Rambles as a member of Levon's band, she did not meaningfully participate in the business and day-to-day operations required to put on the Midnight Rambles. Levon did not make Amy a stockholder in LHS during his lifetime despite Amy's requests that he do so, and Amy did not receive a financial interest in LHS until after Levon's death, when half of his shares passed to her.

26.     Defendant George T. Gilbert, Esq. is an individual who, upon information and belief, resides in South Salem, New York, and is a citizen of the State of New York. Upon information and belief, Attorney Gilbert and Attorney Fletcher were longtime

12

friends, and Amy first met Attorney Gilbert through Attorney Fletcher between 2016 and 2017. Upon information and belief, Attorney Gilbert began working for Amy at some point in 2018. Since that time, he has represented, or held himself out as representing: (1) Sandy, both in her role as the administratrix of the Estate and as a stockholder of LHS; (2) LHS; (3) Amy; and (4) multiple entities owned by Amy, including entities that engaged in conflicted transactions with LHS.[6] LHS is not aware of any conflict waivers signed by a disinterested stockholder or director of LHS that would permit Attorney Gilbert to represent multiple parties with legal conflicts against one another.

27.     Defendant Francis "Frank" Flynn, CPA is an individual who resides, upon information and belief, in Kingston, New York, and is a citizen of the State of New York. Levon retained CPA Flynn to provide accounting services to Levon, Sandy, and LHS around the time Levon incorporated LHS. As the accountant for Levon (and later his Estate) and LHS for approximately twenty years, CPA Flynn has substantial knowledge about and access to financial information and accounts related to both. After Amy became President of LHS in 2017, CPA Flynn had virtually unfettered access to LHS accounts, and he could transfer money and classify transactions with no oversight from other LHS stockholders. As LHS' accountant, CPA Flynn was aware of Amy's self-dealing transactions with LHS, use of LHS accounts for personal expenditures, unauthorized transfer of Estate assets into LHS accounts, inexplicably large administrative salaries at LHS, and LHS' mounting losses, yet CPA Flynn failed to alert the other LHS stockholders. CPA Flynn also assisted Amy and Attorney Gilbert to transfer income generated by the Infringing Mark away from LHS for Amy's personal benefit. Finally, LHS' ongoing review

---

[6] A copy of a redacted invoice from Attorney Gilbert billing for simultaneous representation of three clients with potential conflicts against one another is annexed hereto as Exhibit O.

of the books and records that CPA Flynn maintained for LHS have identified a number of irregularities that LHS is currently unable to explain and appear inconsistent with generally accepted accounting principles.

28.    Defendant The Helm Family Midnight Ramble LLC ("THFMR") is a limited liability company formed under the laws of the State of New York and does business in South Salem, New York. Upon information and belief, THFMR has one member: Defendant Amy Helm, who is a citizen of the State of New York. Attorney Gilbert formed THFMR upon agreement with Amy and CPA Flynn for the purpose of diverting any revenue Amy made from her use of the Infringing Mark away from LHS and into her personal company.

29.    Defendant Lori Peters is, upon information and belief, an individual who resides in Somerville, Massachusetts, and is a citizen of the State of Massachusetts. Peters is Amy's agent and has assisted Amy in profiting from the Infringing Mark by, among other things, working with Amy to publicize and book shows under the Infringing Mark.

30.    Defendant Sharon Fletcher, Esq. is an individual who resides, upon information and belief, in Kingston, New York, and is a citizen of the State of New York. Levon first retained Attorney Fletcher in early 2011 upon CPA Flynn's recommendation, in order to prepare a last will and testament for Levon. However, Attorney Fletcher told Sandy while she was seated in front of Levon's casket at his funeral on April 27, 2012 that Levon had not in fact signed the will, meaning Levon died intestate. Following Levon's death Attorney Fletcher continued to represent Sandy in her role as administrator of Levon's Estate, and later also began to act as an attorney for LHS by, among other things, hiring outside counsel on LHS' behalf, negotiating a potential repurchase of shares from Sandy, one of its stockholders, chairing LHS stockholder meetings, holding LHS records,

14

and advising the board of directors of LHS to dissolve the company. Upon information and belief, Attorney Fletcher also began to advise Amy on Amy's own legal matters relating to, among other things, the Estate and LHS. LHS is not aware of any conflict waivers signed by any disinterested stockholder or director of LHS that would permit Attorney Fletcher to represent multiple parties with legal conflicts against one another.

31.   Defendant Christy Newman is an individual who, upon information and belief, resides in Woodstock, New York, and is a citizen of the State of New York. Upon information and belief, Amy hired Christy to work at LHS in 2018, where she continued to work until mid-2026 when she resigned following Amy's removal as President of LHS. During that time, LHS paid Christy hundreds of thousands of dollars, but upon review of her LHS email correspondence after her resignation, LHS determined that Christy spent the bulk of her time as an LHS employee working on behalf of Amy and companies Amy owned. Prior to resigning, Christy helped shred an unknown number of physical documents maintained at LHS' offices at The Barn, and between May 28, 2026 and June 1, 2026 she deleted nearly 2,400 emails from her work email account that LHS later reviewed to determine she was working for Amy while being paid by LHS.

32.   Defendant Jenn Van Steenburg is an individual who, upon information and belief, resides in Woodstock, New York, and is a citizen of the State of New York. Upon information and belief, Amy hired Jenn to work at LHS in 2023, where she continued to work until mid-2026 when she resigned following Amy's removal as President of LHS. Like Christy, Jenn spent most of her time working for Amy and her companies. Prior to resigning, Jenn assisted Christy with shredding documents maintained at The Barn, and also deleted a more modest 101 emails relating to her work for Amy and her companies while being paid as an LHS employee.

**Facts**

### A. The Midnight Rambles and LHS

33.    Levon started the Midnight Rambles in January 2004 when, after years of financial hardship that he attributed in large part to unfavorable agreements he believed he was forced to sign as a member of The Band, he and Sandy had defaulted on their mortgage and faced a foreclosure auction. Levon previously threw concerts at various other venues in the 1980s when he and Sandy faced financial troubles, and planned to do so again. He discussed holding the concerts at a venue in Schenectady, New York, and described the concerts as "midnight rambles" as a nod to his childhood in Arkansas, when traveling musicians would play a family-friendly show first and then, after 10 PM, play a "midnight ramble" with racier material for adults.

34.    When Levon shared this plan with his general manager, Brian, Brian suggested that Levon play the show at the Barn instead and call it "The Midnight Ramble." Levon immediately signed off on the idea, saying "Sounds good B. It's $100 a ticket." Levon announced the first Midnight Ramble on January 12, 2004, tickets went on sale shortly thereafter. The first Midnight Ramble took place on January 24, 2004, with Brian's band, the Apple Pickers Union, opening the event at Levon's request.

35.    Amy participated in the first Midnight Ramble as a part of the Midnight Ramble Band, but when Levon asked her to help him to do the work behind the scenes to organize and put on the Midnight Rambles, she declined. Amy also expressed her concern to both Brian and Barbara that, while she appreciated their efforts, she believed Levon and Sandy would lose the house and that they were getting his hopes up.

36.    While the Midnight Rambles became increasingly popular, their fundamental purpose never changed: generate enough income for Levon and Sandy

16

through renting The Barn out for performances and ticket sales to pay the mortgage on their home. When Levon incorporated LHS in October 2004 this was not stated in its bylaws, but the original stockholders still understood what Levon meant for LHS to do.

37.    And it worked. While Levon and Sandy ultimately started bankruptcy proceedings in mid-2004 to stop the foreclosure sale of their home, the Midnight Rambles were becoming more popular and generating more income, and by 2006 Levon and Sandy were earning enough money through the Midnight Rambles that the bankruptcy judge allowed them to exit bankruptcy with all of their assets and their home.

38.    During the next five years, Levon experienced a career renaissance in addition to the success of the Midnight Rambles. He formed Dirt Farmer in 2007, and later recorded and distributed three new GRAMMY-winning albums through the company. Unfortunately, his cancer returned in late 2011, and while he continued to perform at Midnight Rambles, it was clear to those around him what was coming. On April 19, 2012, Levon passed away. His last words were to Barbara and Amy: "Keep it going." The meaning was clear, he loved LHS and the artistic freedom it gave him, and he knew how important LHS was to helping Sandy keep their home. Four days after Levon passed away, and before Levon was interred in the Woodstock Cemetery, Barbara reported to CPA Flynn that Amy had just left her office with a $10,000 check issued from one of Levon's companies, which Amy ominously said would help "as a start." At the same meeting, Amy told Barbara that she "started worrying that the estate would be left in Sandy's hands," and that Sandy could make "sole decisions" about the estate. Barbara, meanwhile, felt that "[t]he calculating and analyzing and plotting wears me out." CPA Flynn forwarded the email to Attorney Fletcher less than twenty minutes later. A copy of the email partial exchange is annexed hereto as Exhibit A.

17

39.    On February 3, 2012, while Levon was on his deathbed, CPA Flynn quietly opened a new account on the LHS general ledger called "Due from Amy," showing that LHS had loaned Amy $432.00 for "Amy NYC – Independent Road Show." Upon information and belief, this is the first transaction that CPA Flynn approved and recorded for Amy's benefit and at LHS' expense. Amy had no role with LHS at the time. By May 2026 when Amy was removed as President of LHS, the "Due from Amy" account had ballooned to nearly $167,000. LHS has no knowledge of Amy receiving any valid approval from any disinterested stockholder or director of LHS to obtain loans from the company, from 2012 through today.

40.    With the benefit of hindsight, it is now apparent that efforts by various Defendants to provide Amy functional control over LHS, the Estate, and other assets began shortly after Levon's death. Four days after Levon's death, Attorney Fletcher offered to represent both Amy and Sandy regarding their interests in the Estate, even though Attorney Fletcher was only representing Sandy at the time. By October 2012, CPA Flynn and a bookkeeper working under his supervision, Cindy O'Connor ("Cindy") were working across LHS, the Estate, and related companies. In February 2013 Amy received her 40% share of LHS from the Estate, and when Brian requested a stockholder meeting in March 2013 to discuss financial issues at LHS and possible solutions, Amy challenged him and asked him what right he had to call for a stockholders meeting. CPA Flynn went a step further, and demanded that Brian sell his shares in LHS back to the company for only $2,000.

41.    Prior to 2017 Amy was largely absent from LHS as she focused on her own music career and touring. She did however continue to use LHS to pay what appear to be personal expenses unrelated to LHS and without the approval of any disinterested

stockholder or director of LHS. CPA Flynn was aware of these transactions, and took steps, when possible, to categorize Amy's expenses as legitimate LHS expenses. In late 2016, Attorney Fletcher introduced Amy to the company that would soon become Amy's personal talent manager, and to Attorney Gilbert, who represented the same company.

### B. LHS's Mark and Defendants' Unlawful Actions.

42.     LHS owns the right, title, and interest in and to the service mark "Midnight Ramble," used in connection with entertainment in the nature of visual and audio performances, namely, musical band, rock group performances; entertainment services in the nature of live musical performances; entertainment services in the nature of presenting live musical performances; and entertainment, namely live performances by musical bands.

43.     LHS' Original Mark is registered with the USPTO under Trademark Registration Number 3985535, with a registration date of June 28, 2011. A copy of LHS' registration certificate and maintenance records for Trademark Registration Number 3985535 is annexed hereto as Exhibit B.

44.     LHS has used the Original Mark in interstate commerce since at least January 24, 2004, and has invested substantial time, effort, and resources in promoting and advertising goods and services offered under the Original Mark.

45.     As a result of LHS' extensive and continuous use of the Original Mark, the Original Mark has become distinctive and has acquired significant goodwill and recognition among consumers of live musical performances.

46.     LHS' use of the Original Mark has been substantially exclusive, and LHS has diligently policed and enforced its rights in the Original Mark.

19

47.    As a result of its widespread, continuous, and exclusive use of the Original Mark to identify its services and LHS as its source, LHS owns valid and subsisting federal statutory and common law rights to the Original Mark

48.    On or about December 31, 2022, Amy began performing under The Infringing Mark at The Barn without permission from LHS. She gave credit for the name to Levon. On January 4, 2023, she announced that the shows would continue on a monthly basis until June 2023. She explicitly stated that she was "re-launching the Midnight  Ramble," which she now described as the "Helm Family Midnight Ramble." A copy of Amy's January 4, 2023 Facebook post is annexed hereto as Exhibit C.

49.    Given where Amy started performing under the Infringing Mark, her statements linking the Infringing Mark to LHS and its Original Mark, the substantial similarity between the two marks, and her use of the Infringing Mark in an identical field as the Original Mark, the likelihood of confusion to the general public that the marks were either identical or affiliated is obvious

50.    On July 15, 2023, Amy requested assistance from Attorney Gilbert and CPA Flynn to create a new LLC "Helm Family Midnight Ramble" in the title. Attorney Gilbert agreed, and when CPA Flynn told her that it may be easier to rename one of the existing, unused companies affiliated with the Estate, Amy stated that she preferred to set up a new LLC because "it's less to explain to Sandy and it starts off with a clear new slate." CPA Flynn agreed, noting that "[l]ess to explain and easy is always good. So let's go with that. I am always looking to clean up loose ends. Have a great weekend!" The July 15, 2023 email chain is annexed hereto as Exhibit D.

51.    One month before Amy first asked to create THFMR, she terminated LHS' relationship with her personal management company. While she told the company that it

20

was due to LHS' desire to go in a different direction, LHS also owed the company a percentage of artist fees and a portion of profits generated from each show at LHS. This company likely would have immediately noticed the loss of revenue to LHS if Amy performed shows there while diverting all the income to another company. LHS believes Amy was motivated, at least in part, to terminate the relationship with this company to make it harder for people to discover that she was diverting income from LHS to herself through THFMR.

52. On October 16, 2023, Amy, still upset at Sandy hiring new and truly independent lawyers to assist her, reached out to Sandy about the attorney costs they were incurring. Amy noted that she believed the best solution to this problem was for Sandy to "stop any more legal advice! Saves a [expletive] ton of money[.]"

53. Two days later, Amy again reached out to Attorney Gilbert, CPA Flynn, and Cindy about "creating a separate entity to hold the earnings from the Helm Family Midnight Ramble." The email chain beginning October 18, 2023 is annexed hereto as Exhibit E.

54. Amy explained, in writing and in detail, her plan to breach her fiduciary duty to LHS by: 1) performing under the Infringing Mark; 2) directly competing with LHS by performing at The Barn without sharing any performance income with LHS; and 3) causing loss of revenue to LHS by competing with it and not sharing profits.

55. Amy noted that the monthly shows were becoming more popular, and had earned LHS approximately $53,000 so far that year, as well as additional income from merchandise sales. However, she explained, "I don't want the profit to roll into the black hole that is LHS, Sandy, etc." She envisioned a "safe, separate place" to keep this income for use by her band, and noted it would have been helpful to have access those funds for

21

her recent tours. While Amy would consider using a portion of this money to pay for The Barn's operating costs, she was adamant that this money flow directly from her band to The Barn and "not [be] shared with Sandy, or the [stockholders]; a completely new and separate operating LLC, outside of the estate and LHS, with only my name on it[.]" She added, several hours later, that part of the reason the shows were so profitable to LHS was that she collected only $6,000 as an artist fee, which was lower than what she charged at other venues. Amy neglected to discuss the fact that she was drawing an approximately $90,000 salary from LHS that year, in addition to the artist fee.

56.    Five days later, Amy declared that it "is imperative that I begin to move my money, and any financial connections I have to LHS & to the estate out of both places." Amy noted her ongoing estate dispute with Sandy, that she had "less confidence" she could resolve the case soon given the presence of truly independent and competent counsel assisting Sandy, and that it was important to set up the LLC and discuss how to divert her bands earnings into it. "I just need the money to sit in the account," she continued, "it can & should sit sit [sic] untouched."

57.    CPA Flynn replied shortly thereafter, voicing some concerns with Amy's plan. He noted that LHS currently had a lease with The Barn, that it would cost time and money for her to set up a ticket sale infrastructure that LHS already had, and, most importantly that she would be competing directly with LHS to put on shows at The Barn without sharing any revenue with LHS, as well as potentially exposing herself to liability. After identifying these "hurdles," CPA Flynn proposed what he knew "is a completely unpopular idea:"

> I know this is a completely unpopular idea, but I have to
> through [sic] it out there just in case it may be viable. IF, IF
> you could make a deal with Brian and Barbara so you can buy

22

their shares in LHS then you would have control over the corporation over Sandy and then this problem (and Barbara and Brian) is solved for you.

58. Attorney Gilbert spoke with Amy the following day about her plan, and five days later he submitted the paperwork to form THFMR to the State of New York. CPA Flynn was correct that it was "completely unpopular" for Amy to consider negotiating a buyout of Barbara's and Brian's LHS shares, and that it was preferable to set up a new company to directly compete with and siphon income from the company that Amy was currently president of: LHS. Amy taking the income the Infringing Mark could potentially generate from LHS appears to be one more step in the conspiracy between her, Attorneys Gilbert and Fletcher, and CPA Flynn to strip LHS of assets before dissolving it.

59. Approximately one month after forming THFMR, Attorney Gilbert submitted a trademark application for the Infringing Mark to the USPTO. The application for the Infringing Mark, annexed hereto as Exhibit F, contains numerous examples of why the Infringing Mark could confuse the public to believe that it was associated with LHS and the Original Mark. They also demonstrate a willful and deliberate intent to trade on the goodwill of the Original Mark by purposely linking the Infringing Mark with the Original Mark, LHS, and Levon. For example:

    a. The website address on the application leads to a page hosted on LHS' own website, which touts the link between the Infringing Mark, LHS, and the Original Mark. Upon information and belief, Amy directed that the page be included within LHS' own website while she was President of LHS;

    b. The Infringing Mark is intended for use in nearly identical fields as the Original Mark;

23

c. THFMR states that it first started using the Infringing Mark on December 31, 2022: when Amy announced a restart of the Helm Family Midnight Rambles while performing at The Barn and in tribute to Levon;

d. Handbills/posters submitted with the application demonstrating use of the Infringing Mark each contain a large photograph of The Barn, and note that the performance would take place at Levon Helm Studios: where LHS offers performances under the Original Mark; and

e. The handbills/posters contain the phrase "THIS WHEEL'S STILL ON FIRE:" a direct callout to The Band's 1968 song "This Wheel's on Fire" and Levon's autobiography, also titled "This Wheel's on Fire: Levon Helm and the Story of The Band."

60. Amy's personal email address is listed on the application as a secondary email address, meaning she should have received personal notice of the USPTO's response.

61. The USPTO rejected Attorney Gilbert's application for the Infringing Mark in June 2024, noting the likelihood of confusion with the Original Mark held by LHS. The USPTO noted that both marks contained the same major words and would be used for similar entertainment services. A copy of the USPTO rejection is annexed hereto as Exhibit G.

62. Neither Attorney Gilbert nor Amy contested the USPTO's rejection of the infringing mark, and in October 2024 the USPTO sent notice to both Attorney Gilbert and Amy that the application had been abandoned. A copy of the USPTO Notice of Abandonment is annexed hereto as Exhibit H.

24

63.     On August 8, 2024, Sandy's attorney for LHS matters emailed Attorney Gilbert to advise him that they had just learned about his and Amy's attempt to register the Infringing Mark through THFMR. He noted that Attorney Gilbert and Amy were both acting adversely to LHS, and that the other members of LHS did not approve of what Amy was doing and demanded that Amy stop using the Infringing Mark and to tell the LHS stockholders about her interests in THFMR and the money she had made using the Infringing Mark. Amy did neither of those things.

64.     Upon information and belief, Amy's agent, Peters, has assisted Amy with her use of the Infringing Mark by, among other things, soliciting business with third parties to allow Amy to perform using the Infringing Mark, negotiating and signing contracts related to the Infringing Mark, and publicizing the Infringing Mark

65.     Amy performed under the Infringing Mark during and after the application process, performed after she was told she was breaching her duties to LHS, and continued to perform under the Infringing Mark after the USPTO rejected it. In fact, two days after LHS informed Amy it was removing her as President, Amy announced a show under the Infringing Mark to take place on October 1, 2026. A copy of Amy's May 29, 2026 Facebook post is annexed hereto as Exhibit I.

66.     On June 10, 2026, LHS, through counsel, sent Peters a cease-and-desist letter advising her that Amy was performing under the Infringing Mark without LHS' consent, and demanding that she stop helping Amy infringe on the Original Mark. A copy of the June 10, 2026 cease-and-desist letter is annexed hereto as Exhibit J.

67.     LHS did not receive a response to its cease-and-desist letter, but on or about June 17, 2026 Amy changed the name of her band to "The Helm Family Ramble Band" and updated her social media to reflect that.

25

### C. Amy's Takeover of LHS That Enabled Her Infringement

68.     Before Amy could begin blatantly infringing on LHS' Original Mark with the enthusiastic cooperation of LHS' outside counsel and CPA, Amy needed to take control of LHS. In February 2017, Sandy met Attorney Fletcher at her office to discuss Estate matters. However, at that meeting Attorney Fletcher began unexpectedly discussing LHS matters, none of which were on the agenda she sent to Sandy before the meeting. The handwritten notes on LHS matters discussed include, among other things, retaining Amy's personal talent manager to help manage LHS, the agenda for the upcoming stockholders meeting, and "Brian." While Attorney Fletcher did not note that Amy attended the meeting, Sandy believes that Amy attended the meeting because Sandy rarely had a meeting with Attorney Fletcher where Amy was not already there.

69.     Two months later, Amy was appointed as President of LHS. Attorney Fletcher hosted the event at her office, ran the stockholder meeting, made various proposals for the stockholders to consider and vote on, and agreed to keep possession of LHS' corporate records at the end of the meeting. Some of Attorney Fletcher's proposals at the stockholder meeting included drafting a new stockholder agreement, hiring Amy's talent manager to manage LHS, to ask Brian to turn over his interest in the company for free, and, shockingly, to dissolve LHS entirely. The stockholders did not approve any of these motions, with Sandy reiterating, emphatically, that she would never dissolve LHS out of respect to her husband Levon and his legacy. A copy of the April 2017 shareholder minutes is annexed hereto as Exhibit K.

70.     By the September 2017 stockholder meeting, Amy effectively sidelined Barbara—who had consistently pushed back on Amy taking personal expenses out of LHS for years—from meaningfully participating in LHS matters going forward. Shortly after

26

that meeting Sandy emailed Brian and Barbara, among others, frustrated with Amy's conduct at the stockholders meeting and how Amy was running LHS thus far. Sandy was concerned by Amy's efforts to take over LHS from her, Brian and Barbara, and she did not approve of Amy pushing to have her own band perform concerts at The Barn in place of other artists, using LHS employees[7] for her personal business, and Amy's suggestion that LHS could stop putting on shows to save money.

71.     Levon's last words to Amy and Barbara about LHS before he died were to "keep it going." Yet one of the first items discussed at Amy's first stockholder meetings as President of LHS was to vote to dissolve the company.

72.     By March 2018, Amy had essentially full control over LHS. She had executed the management agreement between LHS and her talent manager without apparent input from the other stockholders and over the objections they expressed to her during the April 2017 stockholders meeting. Amy hired Cindy and Christy as full-time LHS employees shortly thereafter, while apparently directing them to devote much of their working time towards Amy and her own businesses. At this point Brian and Barbara lost meaningful access to LHS' books and records, and were no longer able to monitor LHS income and spending. Their future requests to inspect LHS' financials and for stockholder meetings were ignored until March 2022, when Amy permitted them to review limited financial statements at LHS' first stockholder meeting in nearly five years.

73.     Governance at LHS deteriorated as LHS' remaining stockholders lost the ability to participate in and review LHS affairs. January 3, 2019, Amy emailed CPA Flynn, Attorney Tom Benton (an associate of Attorney Fletcher), and Cindy that she wanted

---

[7] Sandy identified Walter Turk ("Walt") as the LHS employee working for Amy while being paid by LHS. Almost nine years later, Walt accompanied Amy to try and pressure Sandy to stop the management change and investigation giving rise to this action.

27

advice on dissolving LHS and starting a new company that did not include Brian or Barbara. While Amy claimed Sandy supported the decision, Sandy had been, and remains, adamantly opposed to dissolving LHS. A copy of this email is annexed hereto as Exhibit L. Upon information and belief, LHS has never signed an engagement letter with Attorney Fletcher. Later in 2019, royalty money from Dirt Farmer that belonged to the Estate and was owed to other band members began to flow into LHS accounts and to be used for LHS purposes.

74.    COVID grants to LHS during 2020 provided additional ways to profit at the company's expense. On April 16, 2020, Amy withdrew a $10,000 loan from the SBA to LHS almost immediately after it was deposited in LHS accounts, for no apparent business purpose. CPA Flynn was also apparently unable to justify this as a business purpose, and on December 31, 2022 he classified the withdrawal as one of the many "Due from Amy" expenses that had no business purpose. Unfortunately, CPA Flynn also noted in July 2020 that the SBA liens on LHS' assets made it harder "to nuke LHS" when the time came. A copy of this email is annexed hereto as Exhibit M.

75.    As COVID-related closure requirements relaxed in 2021 and LHS resumed consistent performances Amy returned her focus to excluding or removing Barbara and Brian from LHS. In September 2021, Attorney Gilbert retained an outside corporate attorney, supposedly on behalf of Amy and Sandy as LHS stockholders, to advise them on, among other things ways to exclude Brian and Barbara from meaningful participation in LHS and deny them access to records. Curiously, a member of the talent management company that Amy retained for LHS over the other stockholders' objection—who has no reason to be involved in the matter—is copied, and suggests that LHS use a portion of the SBA grant it just received to pay the outside corporate attorney. Days later, Amy gushed

28

that the advice from the outside counsel about LHS' allegedly limited obligation to share financial records with stockholders Brian and Barbara was the "[b]est $2000 LHS ever spent" A copy of the relevant emails are annexed hereto as Exhibit N. Attorney Gilbert later told Attorney Fletcher that he was authorized to retain this corporate lawyer "In [his] role as General Counsel of Levon Helm Studios, Inc., with the consent and at the direction of Amy Helm President of Levon Helm Studios Inc.:" an admission that he was acting on behalf of Amy to advise her on how to exclude Barbara and Brian from LHS.

76.    Beginning in 2022 Attorney Gilbert started to formally bill LHS for work performed as its outside counsel, even though he appears to have been working on behalf of LHS for some time prior. His first bill to LHS noted that, while simultaneously working for LHS, he was working for the Estate (meaning Sandy), as well as Amy personally. A redacted copy of Attorney Gilbert's bill showing this simultaneous representation is annexed hereto as Exhibit O. LHS is unaware of any conflict waivers conflict waivers signed by any disinterested stockholder or director of LHS that would permit Attorney Gilbert to work for LHS while also representing and working with Amy against other LHS stockholders, and does not know who at LHS authorized him to work on behalf of the company. Several months later, LHS held its first stockholder meeting in nearly five years; the corporate attorney who Attorney Gilbert hired to advise Amy on how to exclude Barbara and Brian chaired the meeting, and intentionally provided them with only limited, and incomplete, financial records for the prior two years.

77.    Buoyed by their perceived success with respect to withholding incriminating financial records from Barbara and Brian, in 2023, Amy, Attorney Gilbert, and CPA Flynn discussed a scheme pursuant to which LHS would assign all of its assets to a limited liability company named "Levon Helm's Barn LLC" in exchange for an

29

artificially low royalty per show, with the explicit goal "to leave LHS Inc [sic] with the minimal amount of assets, income and liability." A copy of these emails are annexed hereto as Exhibit P. Separately, they planned to hire an outside expert who CPA Flynn had a relationship with, to estimate LHS' value after Amy, Attorney Gilbert, and CPA Flynn stripped it of all its assets. The valuation expert would, of course, then report that LHS was not worth much, which would allow Amy, Attorney Gilbert, and CPA Flynn to pay as little as possible to the other stockholders when they finally dissolved LHS. A copy of these emails are annexed hereto as Exhibit Q.

78.     By mid-2023, Sandy became sufficiently concerned with the quality of representation she was receiving from Attorneys Fletcher and Gilbert on her behalf, and retained new counsel to assist her with matters regarding the Estate and LHS. Sandy was wise to be concerned with their representation. On August 15, 2023, Attorney Gilbert emailed Amy, Attorney Fletcher, CPA Flynn, and Cindy to set up a "[c]onference call today re Sandy." Given that both Attorneys Gilbert and Fletcher represented Sandy, it is concerning that they would schedule a call to discuss their client with Amy, after Sandy started consulting with attorneys who did not have a personal relationship with Amy like they did. A copy of these emails are annexed hereto as Exhibit R.

79.     Shortly after this conference call, Amy showed up unannounced and uninvited at Sandy's residence, and let herself in, and attempted to go up the stairs to the second level where Sandy's bedroom is located. Sandy appeared at the top of the stairs, and Amy proceeded to berate her for hiring new lawyers, claiming that they could not afford them and demanding that Sandy immediately fire them. Sandy retorted that "We can afford your $90,000 salary," leaving Amy speechless. Once Amy gathered herself, she

30

said "That's not even enough," despite the fact Amy performed almost no services for LHS beyond performing at concerts at The Barn, for which she was separately compensated.

80. Weeks later, when one of Sandy's new lawyers asked Attorney Fletcher why Sandy was being prevented from accessing estate and LHS financial records, Attorney Gilbert and Attorney Fletcher, along with CPA Flynn, Amy, and Cindy began coordinating ways to continue to deny Sandy access to those records. Attorneys Fletcher and Gilbert then conferred together to prepare a response to Sandy's new lawyer accusing Sandy— their own client—of acting improperly with Estate funds. A copy of these emails are annexed hereto as Exhibit S. Several days later during further discussions as to how to respond to Sandy's new lawyer's request for financial records, Attorney Gilbert circulated a lengthy summary of New York law about estate administrators, their responsibilities, and claims that can be made against them. To be clear: Attorney Gilbert was providing legal analysis to Amy and others about possible claims against estate administrators, while Attorneys Gilbert and Fletcher currently represented Sandy, as administrator of the Estate.

### D. Sandy and LHS Stockholders Push Back Against Amy

81. By the end of 2023, Sandy and her new attorneys finally gained access to the complete Estate financial records, which had been withheld from Sandy even though she was the administrator of Levon's estate. Cindy resigned as bookkeeper for the Estate, and by the end of January 2024 Attorney Fletcher abruptly resigned as Sandy's counsel and CPA Flynn resigned as accountant for LHS, the Estate, and affiliated estate companies, noting that it was for "reduced workload, no other reason." Without CPA Flynn and Cindy controlling the books for these entities, and with Sandy's new lawyers keeping a more watchful eye on both LHS and the Estate, wasteful spending at LHS

31

dropped considerably, and the company went from losing over $277,000 in 2023 to "only" losing approximately $53,000 in 2024. However, financial conditions at LHS remained dire due to Amy's prior years of mismanagement, and on April 15, 2025, Amy told Cindy, Christy, and Jenn that, for LHS to survive, "I either have to find a loan from somewhere or declare bankruptcy." A copy of this email is annexed hereto as Exhibit T.

82. On June 6, 2025, Sandy, Brian, and Barbara, due to continuing concerns as to LHS' financial health and in response to a lawsuit that Amy filed against Sandy relating to the Estate, each executed actions by written consent, consistent with New York law. These written consents of the majority stockholders and the newly constituted board of directors of LHS removed Amy a director and as President, appointed Sandy as President, and called for retaining an accountant to review LHS' financials. Copies of the written consents are annexed hereto as Exhibit U. LHS promptly provided these written consents to Amy, but approximately one month later, Amy's new attorney, David Baram, rejected the written consents as improper and stated they had not "withstood judicial scrutiny." The implication was clear: Amy would not vacate her position as an officer or director of LHS without a court order instructing her to do so. While Attorney Baram was legally incorrect, Amy used this opinion to continue operating LHS as its President, even though she now held no official position with the company.

83. On May 26, 2026, Sandy, Barbara, and Brian agreed as majority stockholders of LHS to appoint Brian as President in Sandy's place, and LHS notified Amy of the change via letter and email on May 27, 2026. Copies of the written consents are annexed hereto as Exhibit V. Also on May 27, 2026, counsel for LHS informed Amy in writing Brian was now President of LHS, that she had been removed as President in June

2025 and was no longer employed by the company, and that counsel intended to investigate her use of the Infringing Mark and the financial health of the company.

84.    On May 28, 2026, Amy and other LHS employees arrived at The Barn and confronted Sandy about the LHS management change. Brian was also present to assist and support Sandy against anticipated pressure from Amy to have LHS stop its investigation and reverse the recent management change. Brian began recording the argument between Sandy and Amy for Sandy's and his protection. Amy was visibly and audibly angry at the management change, denying that she had done anything wrong and at one point ominously growling at Sandy "If you go through with this . . . ." When Amy saw Brian observing her yelling at Sandy, she cursed at him, told him to leave, and began shoving him in the back until he was out of the studio. When Brian advised Sandy that she did not need to engage with Amy and could leave the matter to counsel, Amy can be heard telling Sandy "Don't let your lawyers deal with it, they're gonna sink you." Amy was aware that she was being recorded yelling at Sandy and Brian by someone else present, but does not appear to realize that Brian was recording their interaction as well.

85.    Brian then left at Sandy's request to allow her and Amy to speak directly, and a security camera at The Barn recorded the multi-hour confrontation between Sandy and Amy. Copies of still photographs from the surveillance video are annexed hereto as Exhibit W. Amy is seen repeatedly yelling at Sandy and standing over her LHS employee Walt Turk, who Sandy identified nearly ten years prior as someone who LHS was paying to largely work for Amy. Sandy advised Brian after the fact that Amy told her that Sandy could not leave until she fired all of her attorneys and Brian. Sandy does not leave the screen to use the bathroom, and she is not provided with anything to eat or drink. Amy appears to review messages that Sandy types on her phone before sending them, and

33

34

Sandy confirmed after the fact that Amy dictated and then proofread the emails that Amy demanded Sandy send to Sandy's personal counsel and to LHS' attorneys. While several attorneys tried, unsuccessfully, to contact Sandy that afternoon to confirm she was ok, the only attorney who was able to speak with Sandy was her recently fired estate attorney, who apparently berated Sandy for rocking the boat" and demanded she keep her appointment to sign an irrevocable trust agreement at his office in Albany, New York, the following Friday, June 5, 2026. LHS understands that the irrevocable trust agreement would have required Sandy to place her inheritance from her husband's estate, and potentially other personal assets like her LHS shares, into a trust controlled by an audio engineer at LHS known to be friendly with Amy and who would have broad powers on what to do with the assets in the trust. If the trust made any money Sandy and Amy would share it while Sandy was still alive, with everything going to Amy and her family after Sandy passed away. Amy, despite claiming under oath to the New York Surrogate's Court for Ulster County on June 4, 2026, that she was deeply concerned about Sandy's mental capacity and ability to enter into legally binding documents, also insisted that Sandy keep her appointment to sign the irrevocable trust agreement, going as far as to offer to drive Sandy to Albany, New York and promise that each of them would receive a $30,000 check after signing. Amy left Sandy's home several hours later when she realized she would not be able to force Sandy to make her President of LHS again or stop the investigation.



*Screenshots from video surveillance stills annexed hereto as Exhibit V. The timestamp on the bottom, righthand photograph shows that it was captured shortly before Sandy emailed LHS' corporate counsel purporting to withdraw her vote for Brian as President of LHS. Upon information and belief, Amy instructed Sandy to send the email after Amy dictated, reviewed, and approved the contents.*

86.     The following day, upon information and belief, Attorney Gilbert drafted an operating agreement to be signed by Sandy and Amy which would have compelled Sandy to transfer her shares in LHS into a company controlled by Amy, to make sure that, as Amy later told Sandy that day, that "[t]his can never happen again." Amy, again accompanied by Walt, brought the operating agreement to Sandy's home. Sandy,

35

concerned based on what happened the day before, refused to allow Amy in her home or to review or sign the agreement. Despite Amy's sworn statement days later to the Ulster County Surrogate's Court professing concern for Sandy's mental capacity and ability to enter into legally binding documents, Amy continues to pressure Sandy to let her inside, demanded she sign the agreement that Amy brought with her, and threatened that every LHS employee would resign at 5:00 p.m. if Sandy did not sign the operating agreement, which would lead to the weekend shows being cancelled. Coincidentally of course, LHS staff and artists scheduled to perform that night would start arriving at The Barn at 5:00 p.m. for the show that evening. Amy further threatened to call the agent for the band playing at The Barn the following night to tell them that the show was cancelled if Sandy did not sign the operating agreement. Sandy nevertheless refused to do so, and Amy ultimately left the property.

87.     On Monday, June 1, 2026, Sandy called Brian and told him that Christy and Jenn had arrived at the Barn around 9:00 a.m., which was highly unusual because they did not typically work Mondays and typically arrived at work around 11:00 a.m. Alarmed, Brian rushed to The Barn. When Brian arrived, Christy and Jenn had already left, and Brian discovered that they had arrived early to clean out their offices after resigning, and to physically shred a number of documents. Brian, who had not terminated either Christy or Jenn and hoped to maintain continuity by allowing them to remain in their positions, called each woman to ask what had happened. The women gave Brian different answers when he asked them what they shredded, and both communicated to Brian that they had resigned due to Amy being removed as President of LHS. Brian also discovered that someone had unplugged vital ethernet cables that controlled the sound system in The Barn, requiring LHS to pay an outside audio engineer to reconnect everything and ensure

36

it was functional. Over the next two days, Brian was forced to change all of the locks out of concern for Sandy's safety and to protect against future vandalism.

88.    After Christy and Jenn resigned on June 1, 2026, Brian demanded that they turn over access to their LHS email accounts to him. After searching their email accounts to determine whether they deleted any emails prior to turning over access, and discovered that, between May 28, 2026 and June 1, 2026, Christy had deleted 2,364 emails and Jenn had deleted 101 emails. Upon recovery and review, the deleted emails showed that Christy and Jenn had used their LHS email accounts to conduct business on behalf of Amy personally and various companies she owned, solidifying LHS' suspicion that Amy had been paying them through LHS to work primarily for Amy and the companies she owned personally.

89.    On June 1, 2026, Sandy and Barbara also executed stock assignments that allowed Sandy and Barbara to keep all economic rights to their LHS shares, but transferred voting rights for those shares to Brian. This was especially important to Sandy, because of the recent pressure Amy applied to her to try and pressure her to rescind her vote to elect Brian as President of LHS. Now that Brian held the voting rights to Sandy's LHS shares, Amy returning to pressure her would have no legal effect on LHS. Amy has since refrained from coming to Sandy's home, further validating the assignment as an effective means of ensuring Sandy's safety.

90.    Amy was scheduled to perform at The Barn on June 6, 2026, and up until June 2, 2026—even after Amy's actions toward Sandy in the preceding days—LHS still offered to let Amy play the show, provided that Amy agreed to certain conditions such as turning over LHS property in her possession, giving LHS access to the various work

accounts she controlled, and to refrain from contacting Sandy to try and get her to unwind the change in leadership at LHS. Amy did not respond, forcing LHS to postpone the show.

91.    On June 26, 2026, LHS reminded Amy's counsel that she had contracted with Sun Records on behalf of LHS to put on two performances on August 1 and 2, 2026 at The Barn, and requested that Amy confirm she would honor the agreement she made with Sun Records on behalf of LHS. The day after the response deadline that LHS set, Amy's counsel responded to LHS to state that she would not agree to perform unless LHS agreed to pay her a minimum of $50,000 for the performance and repay Amy for approximately $101,000 in loans she claims she made to LHS. This payment demand likely exceeded the total revenue LHS intended to receive from both shows, and did not account for the approximately $167,000 in unauthorized loans made to Amy and recorded under LHS' "Due from Amy" account. Amy, as LHS' former President, would have known that she was demanding more to play the shows than LHS would have earned from putting them on. Upon information and belief, Amy made this excessive payment demand hoping to force LHS to postpone the shows, a move she anticipated would give her the opportunity to mobilize a boycott against LHS, the company her father started, as part of a pressure campaign meant to force Brian to resign as President and stop his inquiry into her malfeasance.

92.    Almost immediately after receiving the postponement announcement, Amy pounced, making a post on July 12, 2026, on her social media channels expressing false surprise at the shows being postponed, claiming that there were "disturbing circumstances behind the current situation," and putting her "faith in the legal system." Amy's further online statements, in which she claimed to be a victim of the LHS management change rather than the reason it happened, resulted in loss of revenue to

38

LHS by ticketholders, artists, and vendors who unwittingly believed that Amy did not deserve to be removed as President of LHS. Upon information and belief, Amy and others acting on her behalf also instituted a campaign to pressure artists, their agents, and vendors who had not cancelled contracts with LHS to do so, resulting in further loss of revenue to LHS.

93.   The fact that Amy has caused shows to be cancelled or postponed and ticketholders to request refunds is particularly underhanded, because she knew that LHS, under her leadership, had already spent much of the money that customers paid to LHS for upcoming shows. This meant that LHS, under new leadership, would need to find the money to repay ticketholders from other sources, because the money the customers had already paid to LHS was not there. One last breach of Amy's duty to the company that her father founded more than twenty years ago. Upon information and belief, Amy directed or approved of this campaign to force LHS to pay refunds to customers for cancelled shows in hope that LHS will run out of funds necessary to continue investigating her and her co-conspirators' actions against LHS or pursue her in court for what she did.

### <u>COUNT I – FEDERAL TRADEMARK INFRINGEMENT</u>
**(As to Amy Helm and THFMR)**

94.   Plaintiff repeats and reallege paragraphs 1 through 92 as if fully set forth herein.

95.   Defendants' unauthorized use of the Infringing Mark in commerce as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendants are in some way affiliated with or sponsored by Plaintiff. Defendants'

conduct therefore infringes on Plaintiff's mark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

96.     Upon information and belief, Defendants have committed the foregoing acts of infringement with full knowledge of Plaintiff's prior rights in the Original Mark and with the willful intent to cause confusion and trade on Plaintiff's goodwill.

97.     Defendant' conduct is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

98.     Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT II – CONTRIBUTORY FEDERAL TRADEMARK INFRINGEMENT
### (As to Attorney Gilbert, CPA Flynn, and Peters)

99.     Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

100.    Defendants Amy Helm and THFMR have directly infringed Plaintiff's trademark rights as alleged in Count I.

101.    Defendants had actual knowledge of Defendants Amy Helm's and THFMR's infringing conduct and of Plaintiff's rights in the Original Mark.

102.    Defendants intentionally induced Defendants Amy Helm and THFMR to infringe Plaintiff's trademark rights by, among other things, counseling Defendant Amy Helm on how to obtain and structure the Infringing Mark to conceal her activities from

Plaintiff and divert revenue from the Infringing Mark from Plaintiff to Defendant Amy Helm, forming Defendant THFMR to apply for the Infringing Mark and divert revenue from the Infringing Mark to Defendant Amy Helm, applying to register the Infringing Mark with the USPTO on behalf of Defendant Amy Helm, soliciting business on behalf of Defendant Amy Helm using the Infringing Mark, and arranging promotional activities featuring the Infringing Mark.

103.    Defendants actively, knowingly, and materially contributed to Defendants Amy Helm's and THFMR's infringement by arranging distribution channels, executing contracts on behalf of Defendants Amy Helm and THFMR, and managing and coordinating infringing activities.

104.    Defendants continued to supply services, support, or assistance to Defendants Amy Helm and THFMR with knowledge that Defendants Amy Helm's and THFMR's conduct constituted infringement of Plaintiff's trademark rights.

105.    Defendants' conduct constitutes contributory trademark infringement.

106.    Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

107.    Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT III – FEDERAL UNFAIR COMPETITION
### (As to Amy Helm and THFMR)

108.   Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

109.   Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendant' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendants are in some way affiliated with or sponsored by Plaintiff.

110.   Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

111.   Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiff.

112.   Defendants' conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

113.   Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

114.   Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant' profits, enhanced damages and profits, reasonable attorneys'

fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

### COUNT IV – COMMON LAW TRADEMARK INFRINGEMENT
### AND UNFAIR COMPETITION
### (As to the Trademark Defendants)

115. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

116. Plaintiff owns valid and subsisting common law trademark rights to the Original Mark.

117. Plaintiff has expended substantial time, skill, labor and money in the creation and marketing of its goods and services under the Original Mark in New York, and providing such goods and services under the Original Mark in New York, and has therefore acquired legally protectable rights in the Original Mark.

118. The Trademark Defendants, through their unauthorized use of and advertising and offering services under the Infringing Mark as alleged herein, as well as contributing to same, including in New York, have unfairly traded on and misappropriated the goodwill and reputation created and developed by Plaintiff in the Original Mark.

119. The Trademark Defendant, without authorization, falsely and deceptively used the Infringing Mark in New York to advertise, sell their own goods, and provide their own services, or assist in same, in violation of Plaintiff's rights under New York common law.

120. The Trademark Defendants' unauthorized use of the Infringing Mark as alleged herein has caused and is likely to continue to cause confusion and deceive consumers as to the origin, source, sponsorship, or affiliation of the Trademark

43

Defendants' goods and services, and is likely to cause consumers to believe, contrary to fact, that the Trademark Defendants' goods and services are sold, authorized, endorsed, or sponsored by Plaintiff, or that the Trademark Defendants are in some way affiliated with or sponsored by Plaintiff, all in violation of Plaintiff's rights under New York common law.

121.    Upon information and belief, the Trademark Defendants' acts as alleged herein were committed with full knowledge of Plaintiff's prior rights in the Original Mark, willfully, deliberately, and in bad faith.

122.    The Trademark Defendants' conduct alleged herein constitutes trademark infringement and unfair competition under New York common law, as provided for in N.Y. Gen. Bus. Law § 360(o).

123.    The Trademark Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to damage Plaintiff unless enjoined by this court. Plaintiff has no adequate remedy at law.

124.    Plaintiff is entitled to injunctive relief, actual and compensatory damages in an amount to be determined at trial, disgorgement of profits, attorneys' fees, costs, and pre-judgment and post-judgment interest.

## COUNT V – CONSPIRACY TO COMMIT TRADEMARK INFRINGEMENT UNDER NEW YORK LAW
### (As to the Trademark Defendants)

125.    Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

44

126. Beginning on July 15, 2023, the Trademark Defendants agreed and acted in concert with one another to allow Amy to perform under the Infringing Mark and to divert any income from doing so away from LHS.

127. Specifically, the Trademark Defendants, jointly and in concert with one another:

    a. Assisted Amy in strategizing ways in which she could perform under the Infringing Mark and direct all income from said performances to herself;

    b. Formed THFMR to allow Amy to direct income from performing under the Infringing Mark to herself and not to LHS;

    c. Attempted to register the Infringing Mark with the USPTO;

    d. Soliciting business on behalf of Defendant Amy Helm using the Infringing Mark;

    e. Contracting with third parties in furtherance of performances under the Infringing Mark; and

    f. Arranging promotional activities featuring the Infringing Mark.

128. The Trademark Defendants' concerted use of the Infringing Mark and support of same was without Plaintiff's consent.

129. The Trademark Defendants knew or should have known that their concerted conduct violated federal and state trademark law.

130. The Trademark Defendants' concerted use of the Infringing Mark and support of same is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendants are in some way affiliated with or sponsored by Plaintiff.

131. As a direct and proximate result of the Trademark Defendants' concerted use of the Infringing Mark and support of same in violation of federal and state trademark law, Plaintiff has suffered and continues to suffer injury, including, but not limited to: loss of sales, revenue, and profits; consumer confusion and deception; and irreparable harm to Plaintiff's business and business relationships.

132. Plaintiff is entitled to injunctive relief, actual and compensatory damages in an amount to be determined at trial, disgorgement of profits, attorneys' fees, costs, and pre-judgment and post-judgment interest, for which the Trademark Defendants are jointly and severally liable.

**COUNT VI – BREACH OF FIDUCIARY DUTY**
**(As to Amy Helm)**

133. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

134. A fiduciary relationship existed between Plaintiff and Defendant Helm arising from her position: as Plaintiff's President; as stockholder of Plaintiff, a closely held corporation; and as a majority stockholder of Plaintiff with the power to dominate and control the corporation.

135. As an officer and majority stockholder in Plaintiff, a closely held corporation, Defendant Helm owed Plaintiff a fiduciary duty of undivided and undiluted loyalty, requiring Defendant Helm to act solely for Plaintiff's benefit, to avoid conflicts of interest, to disclose all material information affecting Plaintiff's interests, to refrain from self-dealing or conduct that placed Defendant Helm's personal interests above those of Plaintiff, and to act with due care and in good faith in the performance of Defendant Helm's duties as an officer.

46

136.    Defendant Helm breached the fiduciary duty owed to Plaintiff by engaging in the misconduct including, but not limited to:

a. Attempting to register and then performing under the Infringing Mark, in competition with LHS and without approval from any disinterested stockholder or director of LHS;

b. Setting up a competing company, THFMR, specifically to direct income generated by her use of the infringing mark away from LHS to her personally;

c. Engaging in self-dealing transactions, including borrowing money from LHS, arranging for LHS employees to draw salaries while mostly working for her, requiring LHS to pay for her personal and unrelated business expenses, and entering into agreements in which she had a personal interest, without approval from any disinterested stockholder or director of LHS and resulting in losses;

d. Acting oppressively towards Sandy by denying her access to the daily management of LHS and its books and records;

e. Acting oppressively to minority stockholders Brian and Barbara by attempting to dissolve or restructure LHS to eliminate them as stockholders, denying them access to the daily management of LHS and its books and records, and refusing to pay them a salary while she was drawing one and also paying outsized salaries to certain LHS employees who she then directed to perform work for her personally while being paid by LHS;

f. Actively concealing her breaches of fiduciary duty by denying stockholder access to books and records that would have revealed the extent of her

47

malfeasance, and directing counsel and CPAs working for LHS to do the same;

g. Refusing to honor a valid stockholder written consent in 2025 removing her as President, and continuing to operate LHS;

h. Making false and/or misleading statements to the public after her removal about the recent LHS management change and her removal as president, classifying it as a takeover of the company and concealing her own breaches of fiduciary duty, causing loss revenue due to artist and vendor cancellations, lower ticket sales, and damage to LHS' reputation;

i. Upon information and belief, soliciting, either personally or through others, artists and vendors to cancel shows and contracts with LHS following the management change at LHS, resulting in loss of revenue;

j. Failing to observe corporate formalities, such as regular stockholder meetings and allowing stockholder access to the company's books and records;

k. Failing to perform at shows she contracted herself to play at as President of LHS;

137. Defendant Helm's misconduct constituted a violation of the fiduciary obligations she owed to Plaintiff within the scope of her relationship as officer and majority stockholder of a closely held corporation, in violation of New York statutory and common law.

138. Plaintiff suffered damages that were directly and proximately caused by Defendant Helm's breach of fiduciary duty.

48

139.    Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, disgorgement of profits, attorneys' fees, costs, and pre-judgment and post-judgment interest.

## COUNT VII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (As to Attorney Gilbert, CPA Flynn, and Attorney Fletcher)

140.    Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

141.    Defendant Amy Helm owed fiduciary duties to Plaintiff, including the duty of loyalty, the duty to act in Plaintiff's best interests, and the duty to avoid conflicts of interest and self-dealing.

142.    Defendant Amy Helm breached those duties, as outlined in this Complaint and alleged in Count VI.

143.    Defendants had actual knowledge of Defendant Amy Helm's breach of fiduciary duty to Plaintiff.

144.    Defendants knowingly induced and participated in that breach by providing substantial assistance to Defendant Amy Helm.

145.    Defendants provided substantial assistance to Defendant Amy Helm in effecting the breach by providing legal and accounting advice that enabled Defendant Amy Helm to breach her fiduciary duties to Plaintiff and to conceal those breaches from Plaintiff and its stockholders, drafting documents and forming companies to facilitate self-dealing transactions and to conceal them from Plaintiff and its stockholders, structuring transactions to benefit Defendant Amy Helm at Plaintiff's expense, and preparing documents that diverted corporate opportunities to Defendant Amy Helm.

49

146. Defendants' substantial assistance was affirmative and material to the accomplishment of Defendant Amy Helm's breach.

147. Defendants' conduct went beyond the provision of ordinary legal and accounting services and constituted active participation in Defendant Amy Helm's wrongdoing.

148. Defendants knew that their assistance would enable Defendant Amy Helm to breach fiduciary duties owed to Plaintiff and acted with the intent to facilitate that breach.

149. As a direct and proximate result of Defendants' knowing participation in and substantial assistance of Defendant Amy Helm's breach of fiduciary duty, Plaintiff has suffered damages, including, but not limited to, financial losses from self-dealing transactions, lost business opportunities, loss of goodwill, and costs incurred to investigate and remedy the breach.

150. Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, disgorgement of fees, attorneys' fees, costs, and pre-judgment and post-judgment interest.

### COUNT VIII – BREACH OF FIDUCIARY DUTY
### (As to Attorney Gilbert and Attorney Fletcher)

151. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

152. A fiduciary relationship existed between Plaintiff and Defendants arising from Defendants' retention as legal counsel to act for and give advice for the benefit of Plaintiff upon matters within the scope of the attorney-client relationship.

153.     As Plaintiff's legal counsel, Defendants owed Plaintiff a fiduciary duty of undivided and undiluted loyalty, requiring Defendants to act solely for Plaintiff's benefit, to avoid conflicts of interest, to disclose all material information affecting the representation, and to refrain from self-dealing or conduct that placed Defendants' interests above those of Plaintiff.

154.     The fiduciary relationship between Plaintiff and Defendants was grounded in a higher level of trust than normally present in arm's-length commercial transactions, arising from Plaintiff's reasonable reliance on Defendants' superior legal expertise and knowledge, and Defendants' de facto control and dominance over the matters entrusted to them.

155.     Defendants breached their fiduciary duty to Plaintiff by engaging in misconduct such as failing to disclose material conflicts of interest, providing advice tainted by self-interest and/or Defendant Amy Helm's interest, and failing to act with undivided loyalty.

156.     Defendants' misconduct constituted a violation of the fiduciary obligations Defendant owed to Plaintiff within the scope of the attorney-client relationship.

157.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff has suffered damages, including, but not limited to, financial losses from self-dealing transactions, lost business opportunities, damage to business reputation and relationships, loss of goodwill, and costs incurred to investigate and remedy the breach.

158.     Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and pre-judgment and post-judgment interest.

## COUNT IX – BREACH OF FIDUCIARY DUTY
### (As to CPA Flynn)

159. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

160. A fiduciary relationship existed between Plaintiff and Defendant arising from Defendant's retention as Plaintiff's certified public accountant to act for and give advice for the benefit of Plaintiff upon matters within the scope of the accountant-client relationship.

161. Beginning in approximately 2004-2005, Plaintiff engaged Defendant to provide accounting services such as tax preparation and planning and preparation of financial statements.

162. During the course of the professional relationship, Plaintiff reposed trust and confidence in Defendant and reasonably relied upon Defendant's superior expertise, knowledge, and professional judgment with respect to these matters.

163. Defendant breached his fiduciary duty to Plaintiff by providing advice tainted by self-interest and the interest of Defendant Amy Helm, assisting Defendant Amy Helm in self-dealing by misclassifying personal charges as legitimate business expenses, concealing self-dealing by Defendant Amy Helm by preparing financial statements concealing the nature and extent of her self-dealing, failing to disclose material errors or irregularities discovered during the engagement, self-dealing, and failing to maintain independence required by professional standards.

164. At the time Defendant engaged in the conduct described above, he knew or should have known that his conduct would harm Plaintiff's interest, violated professional standards, created a conflict of interest, and compromised his independence.

165. Defendant failed to disclose to Plaintiff that Defendant Amy Helm was engaging in self-dealing, that he was assisting her with misclassifying personal charges as legitimate business expenses, and that he was preparing financial statements and taxes for Plaintiff that concealed the nature and extent of Defendant Amy Helm's self-dealing.

166. Had Plaintiff known about Defendant's conflict, Plaintiff would have terminated the engagement, sought independent financial advice, corrected its financial statements, and modified its business practices.

167. Defendant's misconduct was undertaken to benefit Defendant Amy Helm and for personal benefit, to conceal his and Defendant Amy Helm's activities, and in knowing violation of his fiduciary duty to Plaintiff.

168. Defendant's misconduct constituted a violation of the fiduciary obligations Defendant owed to Plaintiff within the scope of the accountant-client relationship.

169. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff has suffered damages, including, but not limited to, financial losses from self-dealing transactions, lost business opportunities, damage to business reputation and relationships, loss of goodwill, and costs incurred to investigate and remedy the breach.

170. Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and pre-judgment and post-judgment interest.

### COUNT X – CONSPIRACY TO  BREACH FIDUCIARY DUTY UNDER NEW YORK LAW
**(As to Amy Helm, Attorney Gilbert, CPA Flynn, and Attorney Fletcher)**

171. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

172.    Each of the Defendants owed a fiduciary relationship to Plaintiff as alleged in Counts VI through IX.

173.    Beginning on or about April 19, 2012, Defendants Amy Helm, CPA Flynn, and Attorney Fletcher agreed to act in concert with one another to breach their respective fiduciary duties owed to Plaintiff by undertaking actions as to Plaintiff and its stockholders intended to benefit Defendant Amy Helm at Plaintiff's expense. Defendant Gilbert joined the conspiracy after he was retained by Defendant Amy Helm and later Plaintiff, and acted in concert with the other Defendants to breach his fiduciary duty to Plaintiff in furtherance of the conspiracy.

174.    Specifically, the Defendants, jointly and in concert with one another:

a.  Assisted Defendant Amy Helm in breaching her fiduciary duties to Plaintiff as a majority stockholder, a stockholder in a closely held corporation, and as a director and officer;

b.  Provided professional advice to Defendant Amy Helm knowing that she intended to use it for her personal benefit and in breach of her fiduciary duties to Plaintiff;

c.  Misrepresenting to Plaintiff that they were providing neutral, outside professional advice and services to Plaintiff with knowledge that Plaintiff would rely on that advice and those services;

d.  Assisting Defendant Amy Helm to undertake self-dealing transactions with using their professional services, such as setting up companies, drafting legal documents and opinions, misclassifying financial transactions, and advising her on how to undertake and/or conceal her self-dealing transactions.

54

175. The Defendants knew or should have known that their concerted conduct breached their respective fiduciary duties to Plaintiff.

176. The Defendants intended to breach their respective fiduciary duties to Plaintiff for their personal benefit and to benefit Defendant Amy Helm at Plaintiff's expense.

177. The Defendants' concerted breaches of their respective fiduciary duties to Plaintiff were part of a common plan to assist Defendant Amy Helm breach her fiduciary duties to Plaintiff.

178. Defendant Amy Helm's breaches of fiduciary duty would not have occurred, or would not have continued through May 26, 2026 without the substantial assistance provided by the other Defendants.

179. As a direct and proximate result of Defendant Amy Helm's breach of fiduciary duty and the remaining Defendants' own breaches of fiduciary duty intending to participate in and substantially assist Defendant Amy Helm's breach, Plaintiff has suffered damages, including, but not limited to, financial losses from self-dealing transactions, lost business opportunities, damage to business reputation and relationships, loss of goodwill, and costs incurred to investigate and remedy the breach

180. Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and pre-judgment and post-judgment interest, for which the Defendants are jointly and severally liable.

## COUNT XI – FAITHLESS SERVANT
### (As to Amy Helm, Christy Newman, and Jen Van Steenburg)

181. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

55

182. Defendants were employed by Plaintiff and owed Plaintiff duties of loyalty, fidelity, and good faith.

183. During their employment, Defendants were faithless in the performance of his duties and services to Plaintiff.

184. Defendants breached their duty of loyalty to Plaintiff by engaging in disloyal conduct as outlined in this Complaint, such as drawing a salary for full time employment from Plaintiff while spending a substantial portion of their working hours working for Defendant Helm personally or for other businesses she owned or was affiliated with.

185. Defendants' misconduct rose to the level of a breach of their duty of loyalty and good faith to Plaintiff.

186. Defendants' disloyal conduct substantially violated their employment relationship with Plaintiff and permeated their service in its most material and substantial part.

187. As a result of Defendants' breach of their duty of loyalty and fidelity, Defendants are disentitled to recover any compensation received from Plaintiff during the period of their disloyalty from 2018 through June 1, 2026.

188. Plaintiff is entitled to disgorgement and forfeiture of all compensation paid to Defendants during the period of their disloyalty

## COUNT XII – ACCOUNTING MALPRACTICE
### (As to CPA Flynn)

189. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

190. At all times relevant to this action, CPA Flynn was a certified public accountant duly licensed to practice in the State of New York.

191. Between approximately 2005 until January 2024, LHS retained CPA Flynn to perform accounting services for LHS, including reviewing transactions and preparing tax returns for the company.

192. As a result of this engagement, a professional relationship existed between LHS and CPA Flynn, and CPA Flynn owed LHS a duty to exercise the degree of skill, care, and diligence commonly possessed and exercised by certified public accountants practicing in the State of New York, to include a duty to perform his work for LHS pursuant to generally accepted auditing and accounting principles.

193. LHS financial records prepared and/or reviewed by CPA Flynn contain noticeable irregularities that are inconsistent with generally accepted auditing and accounting principles, including deleting entries from accounting records, failing to account for unearned income, and classifying what appear to be expenses for Amy unrelated to her work with LHS as legitimate business expenses.

194. CPA Flynn's duties to LHS further included a duty to identify, investigate, and report material irregularities, fraudulent transactions, and departures from generally accepted auditing and accounting principles discovered during the course of the engagement.

195. While working for LHS, serious fraudulent transactions occurred within LHS's business operations, including Amy taking loans from LHS, LHS borrowing money from the Estate, transfer of Estate assets to LHS accounts for no apparent business purpose, and attempts by Amy to classify her personal and business expenses unrelated to LHS as legitimate business expenses.

196. These fraudulent transactions were material to LHS' financial statements and business operations, and CPA Flynn failed to identify, investigate, and report these

57

fraudulent transactions, even though they would have been discoverable through the exercise of reasonable professional care and generally accepted auditing and accounting principles.

197.    CPA Flynn's failure to identify, investigate, and report the fraudulent transactions also constituted a material departure from generally accepted auditing and accounting principles by permitting the preparation and issuance of financial statements that failed to fairly present LHS' financial position and results of operations

198.    CPA Flynn knew, or in the exercise of reasonable professional care should have known, that LHS was relying upon CPA Flynn's professional services to detect material irregularities and fraudulent activity.

199.    As a direct and proximate result of CPA Flynn's departures from accepted professional standards, LHS has sustained actual damages in an amount to be determined at trial,

200.    CPA Flynn's negligence and departures from accepted professional standards were a substantial factor in causing LHS' damages.

201.    Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, attorneys' fees, costs, and pre-judgment and post-judgment interest.

### COUNT XIII – TORTIOUS INTERFERENCE WITH CONTRACT
### (As to Amy Helm)

202.    Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

203.    At all times herein, Defendant Amy Helm was an officer and majority stockholder of Plaintiff, a closely held corporation.

204. Prior to May 26, 2026, Plaintiff entered into valid and binding agreements with third parties for, among other things, musical performances.

205. Defendant Amy Helm had actual knowledge of these contracts by virtue of her position as an officer of Plaintiff and her agreement to personally perform and/or assist with performance of certain of these musical performances.

206. After Plaintiff removed Defendant Amy Helm as an officer and employee on May 26, 2026, Defendant Amy Helm made false and/or misleading statements as to the circumstances surrounding her removal to the general public to conceal that she was removed as an officer and employee for, among other things, breaches of fiduciary duty to Plaintiff.

207. Defendant Amy Helm also refused to honor her contractual obligation to assist with at least one of Plaintiff's contracts for musical performances leading to a cancellation of said contract.

208. Defendant Amy Helm made these false and/or misleading statements to the general public with knowledge that they would induce third parties to cancel contracts for musical performance with Plaintiff.

209. Plaintiff intended to induce third parties to cancel contracts for musical performance with Plaintiff by making false and/or misleading statements to the general public.

210. Defendant Amy Helm acted with actual malice toward Plaintiff and with the intent to injure Plaintiff's business relationships.

211. Defendant Amy Helm's actions were without justification.

212. As a direct and proximate result of Defendant Amy Helm's actions, numerous third parties have cancelled contracts with Plaintiff for, among other things, musical performances.

213. These cancellations would not have occurred but for Defendant Amy Helm's intentional inducement.

214. As a direct and proximate result of Defendant Amy Helm's tortious interference, Plaintiff has suffered actual damages, consisting of lost profits, costs incurred in preparation for performance, loss of business reputation, and expenses incurred in attempting to mitigate damages.

215. Plaintiff is entitled to actual and compensatory damages in an amount to be determined at trial, disgorgement of fees, attorneys' fees, costs, and pre-judgment and post-judgment interest.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully request that the Court grant relief by:

a. Awarding Plaintiff actual and compensatory damages in an amount to be determined at trial;

b. Awarding Plaintiff punitive damages in such amount as the Court deems just and proper to punish Defendants' willful and egregious breaches of fiduciary duty and to deter similar misconduct;

c. Declaring that Trademark Defendants have infringed Plaintiff's registered mark in violation of 15 U.S.C. § 1114;

d. Permanently enjoining the Trademark Defendants, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, from using the Infringing Mark or any other mark

confusingly similar to Plaintiff's Original Mark in connection with the advertising, promotion, offering for sale, or sale of any goods or services;

e. Ordering the Trademark Defendants to deliver up for destruction all materials in their possession, custody, or control that bear the infringing mark, including but not limited to promotional materials, recordings, merchandise, signage, and advertising materials;

f. Awarding Plaintiff its actual damages sustained as a result of the Trademark Defendants' infringement, together with any profits of the Trademark Defendants attributable to the infringement that are not considered in computing actual damages, in an amount to be determined at trial;

g. Trebling the damages awarded against the Trademark Defendants pursuant to 15 U.S.C. § 1117(a) based on their willful and intentional infringement;

h. Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding Plaintiff its costs and reasonable attorneys' fees as against the Trademark Defendants thereunder (15 U.S.C. § 1117(a));

i. Awarding Plaintiff an accounting of all profits, benefits, and property obtained by the Defendant through the breach of their respective fiduciary duties and a constructive trust over such profits, benefits, and property;

j. Ordering Defendants Amy Helm, Christy Newman, and Jenn Van Steenburg to disgorge and forfeit all compensation received from Plaintiff during the period of 2018 through June 1, 2026;

k. Holding Defendant Amy Helm jointly liable for all compensation Defendants Christy Newman and Jenn Van Steenburg received from Plaintiff during the period of 2018 through present;

61

l.  Awarding Plaintiff its costs and disbursements incurred in this action;

m.  Awarding Plaintiff pre-judgment and post-judgment interest at the maximum rate permitted by law;

n.  Awarding Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury.

Dated: August 10, 2026

Respectfully submitted,

*/s/ Peter Luccarelli*
Peter A. Luccarelli
peter@brightpoint.law
Brightpoint Law, LLP
1059 Broadway, Rear
Woodmere, NY 11598
(917) 310-4822
*Counsel for Plaintiff*