# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER

AMY HELM, individually and derivatively on behalf of LEVON HELM STUDIOS, INC.,

Plaintiff,

-against-

BRIAN PARILLO and LEVON HELM STUDIOS, INC.,

Defendants.

Index No.:

**COMPLAINT**

Plaintiff Amy Helm, individually and, where indicated, derivatively on behalf of Levon Helm Studios, Inc., by and through her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants Brian Parillo and Levon Helm Studios, Inc., alleges as follows:

**INTRODUCTION**

1. This action arises from an illegal attempt by Defendant Brian Parillo ("Parillo") to take over the company and concert venue, and usurp the musical legacy, that belonged to the late Levon Helm ("Levon"), a legendary drummer, vocalist, actor, and member of the Rock & Roll Hall of Fame for his central role in the iconic rock group called The Band.

2. In the last years of his life, Levon presented a series of renowned concerts at the Barn, his home and recording studio in Woodstock, New York, which were known as the "Midnight Rambles." Upon Levon's death in 2012, his share of the business entity that ran these concerts—Levon Helm Studios, Inc. ("LHS" or "the Company")—was entrusted to the family he left behind. Levon's only daughter (and a celebrated musician in her own right), Plaintiff Amy Helm ("Amy"), owns 40% of the Company, has served as its President since 2017, and has carried on her father's

work by organizing and performing concerts at the Barn. Levon's wife Sandra Helm ("Sandy"), Amy's stepmother, owns 40% as well, and served as the Company's Vice President for several years. Parillo owns 10% of the Company, has no family relationship to Levon, and played no role in the management of the Company or organization of its concerts for most of the past two decades.

3. In the past sixteen months, Parillo has attempted to wrest control of LHS from Amy and Sandy, who is Levon's widow, now in her mid-seventies. His efforts have included preying on Sandy's financial and personal vulnerabilities and using LHS to publicly attack Amy. Among other things, he has threatened, in his counsel's words, to reduce Amy's "career as a touring musician" to "smoking ruins." (*See below* ¶62).

4. Amy and Sandy are Levon's sole heirs and Sandy was appointed administrator of his estate, which is still open in Ulster County Surrogate's Court (the "Estate Proceeding"). Amy recently discovered that Sandy had misappropriated what is likely hundreds of thousands of dollars in estate assets. This led the Surrogate's Court to order Sandy to file an accounting and appoint the Public Administrator to replace her, and in July 2026 to appoint a guardian *ad litem* for her.

5. Parillo seized the opportunity presented by Sandy's financial, legal, and personal difficulties to intimidate Sandy into signing over control of LHS. Parillo did so through a series of purported corporate actions which, as alleged below, violate the BCL and the Company's Certificate of Incorporation. Parillo then used his control to exclude Amy from the Company's management and waste Company assets by suing Amy—along with lawyers, an accountant, and longtime LHS staff—in federal court in the name of the Company (the "Federal Action") in an attempt to "force [Amy] to buy the company back from him for $5 million dollars." (*See below* ¶62). And at the Barn—which doubles as Sandy's home—Parillo has changed the locks, attempted

to control Sandy's life, cancelled Amy's concerts, and alienated the music fans, artists, and employees who gave the venue life.

6. Parillo's illegal takeover of LHS was achieved through a series of invalid corporate acts. First, on June 6, 2025—just days after Sandy was served with Amy's petition in the Surrogate's Court to compel Sandy to account for her alleged embezzlement from Levon's estate—Parillo got Sandy to join him and another shareholder in signing a written shareholder consent that purported to remove Amy as a director of LHS. Sandy then signed a second document, as the Company's purported sole director, that claimed to remove Amy as President of LHS.

7. Then, on May 26, 2026, Parillo procured Sandy's signature on a written shareholder consent that purported to remove Sandy as the Company's sole director and install Parillo in her place. Parillo then signed a board consent, purportedly acting as the Company's sole board member, naming himself President, Secretary, and Treasurer and declaring that no one else had authority to act for the Company. Days later, on June 1, 2026, after Parillo and an associate spent a full day with Sandy at her home, Parillo obtained an instrument purporting to transfer to himself the right to vote Sandy's shares in LHS.

8. Every one of these corporate acts is void. The Company's Certificate of Incorporation does not permit shareholders to act by written consent of fewer than all shareholders. Under BCL §615(a), absent such a provision, shareholders may act without a meeting only by written consent signed by the holders of all outstanding voting shares. Amy, who holds 40% of the Company's shares, never signed any of the consents. No shareholder meeting was ever noticed or held. And because Amy was never lawfully removed, the purported "sole director" consents signed by Sandy and by Parillo are void.

9. The consents and the voting assignment are independently void because Parillo procured them through undue influence over a vulnerable person who lacked the ability to understand the nature and consequences of those documents. Sandy is in her mid-seventies. Within days of signing the consents that purportedly gave Parillo control of the Company, she told Amy that she had been "conned" by Parillo and that Parillo and his lawyers "just keep getting in my head. I don't know what's wrong with me." A true and correct copy of Amy's sworn affirmation (without exhibits) filed in the Surrogate's Court, from which the foregoing quotations are taken, is attached as Exhibit A. Based in part on Sandy's comments, the Ulster County Surrogate's Court appointed a guardian *ad litem* for Sandy, reciting that she "is a person under disability" and ordering the guardian to file a written report concerning her ability to participate in the Estate Proceeding. A true and correct copy of the Surrogate's Order appointing the guardian is attached as Exhibit B.

10. Parillo admits that Sandy is vulnerable to influence. In the Federal Action, the complaint that Parillo directed to be filed specifically alleges that Sandy needs to be shielded from "attempts at coercion" and that the purported assignment of Sandy's voting rights was necessary so that "pressure" on Sandy "would have no legal effect on LHS." (*See below* ¶54). But having recognized that Sandy could not protect her own interests, Parillo did not ask a court to appoint a neutral guardian to protect her, as Amy did in the Estate Proceeding. Instead, Parillo took Sandy's voting power for, and to benefit, himself—within days after Sandy told LHS's counsel that she wanted to withdraw her consent naming Parillo the sole director, he manipulated her to sign over the right to vote her shares to him. The result was that Sandy's own wishes about her shares would no longer matter, and Parillo—who owns 10% of LHS—now purports to control 60% of its votes.

11. In this action, Amy seeks to reassert control of LHS which Parillo has illegally seized, and in so doing, restore the Midnight Rambles to their rightful place as the family legacy of Levon and a cherished part of the Woodstock community. Amy seeks (1) declarations that the purported corporate actions orchestrated by Parillo in 2025 and 2026 are void and that Parillo had no authority to cause LHS to bring the Federal Action; (2) an order removing Parillo for cause as a director and officer of LHS and recognizing Amy as a director and President of LHS; and (3) damages and other relief related to Parillo's breaches of fiduciary duty to the Company.

**PARTIES**

12. Plaintiff Amy Helm is an individual residing in Woodstock, Ulster County. Amy is the daughter of Levon Helm, and the holder of 40% of the issued and outstanding shares of LHS. Amy has served as a director of LHS since March 2013, and as LHS's President since April 2017.

13. Defendant Brian Parillo is an individual residing in Woodstock, New York. Parillo owns 10% of LHS's shares and, since late May 2026, has held himself out and purported to act as LHS's sole director and President, Secretary, and Treasurer.

14. Levon Helm Studios, Inc., which is both a derivative Plaintiff and a Defendant, is a domestic business corporation organized under the laws of the State of New York, with its principal office at 160 Plochmann Lane, Woodstock, New York. Its Certificate of Incorporation was filed on October 25, 2004 under the name "Levon Helms Studio's Inc." and its name was changed to "Levon Helm Studios, Inc." by a Certificate of Amendment filed on May 16, 2008. True and correct copies of the Certificate of Incorporation and Certificate of Amendment are attached as Exhibits C and D.

## JURISDICTION AND VENUE

15. This Court has personal jurisdiction over all Defendants under CPLR §301 because all are domiciled in Ulster County, New York. All Defendants regularly and purposefully avail themselves of the privilege of conducting business in Ulster County, New York.

16. Venue is proper in this Court pursuant to CPLR §§503(a) and 503(c) because Plaintiff and all Defendants are domiciled in Ulster County, New York and because a substantial part of the events or omissions giving rise to the claims occurred in Ulster County, New York.

## FACTUAL BACKGROUND

### A. Levon Helm and the Formation of LHS

17. Levon Helm was one of the most celebrated American musicians of his generation. As the drummer and a lead vocalist of The Band, he gave voice to songs that remain fixtures of the folk and rock music canons and was inducted into the Rock & Roll Hall of Fame. Later in his career—in addition to his GRAMMY Award-winning solo albums and respected work as a film actor—Levon began hosting the Midnight Rambles, a series of intimate concerts at his home studio in Woodstock known as "the Barn." These concerts drew renowned musicians and devoted audiences from across the nation and became an important part of his legacy. Levon died intestate on April 19, 2012, survived by his wife, Sandy, and his only daughter, Amy, the latter of whom performed beside him at the Midnight Rambles and has carried his musical legacy forward since his death.

18. LHS was formed in 2004 to formalize the business that Levon was conducting in connection with the Midnight Ramble concerts. Its Certificate of Incorporation (Ex. C) contains six articles, none of which authorizes the Company's shareholders to take action by written consent signed by fewer than all of the holders of outstanding shares entitled to vote. Nor is any such

authorization granted by LHS's only Certificate of Amendment (Ex. D), which changed the Company's name.

19. On October 25, 2004, the Company's incorporator adopted the Company's By-Laws (the "By-Laws"), a true and correct copy of which is attached as Exhibit E. The By-Laws provide, among other things, that:

a. shareholder action without a meeting may be taken on written consent only "in accordance with the provisions of Section 615 of the Business Corporation Law" (Art. I, §7);

b. action by the Board without a meeting may be taken only "if all of the members of the Board of Directors . . . consent in writing" (Art. II, §7); and

c. a shareholder proxy "shall be revocable at the pleasure of the shareholder executing it, except as otherwise provided by the Business Corporation Law" (Art. I, §6).

20. At the time of his death, Levon held 80% of the Company's shares, and Parillo and Barbara O'Brien ("O'Brien"), a former LHS manager, each held 10% of the shares. Upon his death without a will, Levon's shares passed equally to Amy and Sandy. Amy and Sandy presently each own 40% of the shares, and Parillo and O'Brien each own 10%.

**B. <u>Amy's Stewardship of Her Father's Legacy as President of LHS</u>**

21. Following Levon's death, the Ulster County Surrogate's Court granted letters of administration for the Estate to Sandy. Amy and Sandy were elected as directors of LHS at a shareholder meeting in March 2013 and were appointed as President and Vice President, respectively, in April 2017. Amy and Sandy held their positions until Parillo attempted to unseat them in 2025 and 2026.

22. LHS's business has always been live music at the Barn. The Barn's studio is a 250-person venue that has hosted six to eight concerts per month. LHS earns its revenue principally from ticket sales for concerts at the Barn, including performances by Amy and her band as well as other artists who visit the venue on tour. As LHS admits in its complaint in the Federal Action (the "Federal Complaint"), the Company's founding purpose was to generate enough income through performances to pay the mortgage on the property at 160 Plochmann Lane where the Barn is located. A true and correct copy of the Federal Complaint (without exhibits) is attached as Exhibit F. The Barn is also where Sandy lives, and it is co-owned by Amy and Sandy as members of Levon's Barn LLC.

23. From the outset, LHS, the Barn, and the Estate were managed informally as one interconnected family operation. A bookkeeper, Cindy O'Connor, kept the books for the Estate, for Sandy, for Amy, and for LHS. Sandy, in her capacities as a director and officer of LHS, administrator of the Estate, and resident of the Barn, was aware of, approved of, and benefitted from the interconnected nature of these operations.

24. The same approach applied to the management of LHS. As stated above, Amy and Sandy were elected as directors of the Company shortly after Levon's death, and served as President and Vice President respectively since 2017. When O'Brien stepped away from LHS's day-to-day affairs in or around 2018, Amy oversaw the hiring of a management company to take on the work of booking and promoting concerts at the venue. During this period, the Company rebuilt its concert calendar and its financial position, achieving positive progress before the pandemic struck and then securing federal financial relief that allowed the Barn to survive the pandemic and reopen for concerts. Thereafter, Amy revived a monthly concert series at the Barn

in the spirit of her father's Midnight Rambles, which proved profitable for LHS in large part because Amy temporarily deferred payment of fees due to her and her band as performers.

25. During this period, the Estate remained unsettled. In August 2023, the bookkeeper, O'Connor, discovered that Sandy had been depositing checks payable to Levon and to the Estate into a secret account that Sandy controlled, even though half of those funds belonged to Amy as co-distributee of the Estate. Nevertheless, Amy's desire was to treat the matter as a family dispute. For almost two years, Amy, through her estate counsel, tried to resolve the matter informally with Sandy's counsel, but was ultimately unsuccessful despite her efforts.

26. In May 2025, Amy filed a petition in Ulster County Surrogate's Court in *Matter of the Estate of Levon Helm*, File No. 2012-330/A (the "Estate Proceeding"), seeking to compel Sandy to account for her actions as administrator and to suspend her letters of administration. The petition was supported by an affirmation of Amy's estate counsel, a true and correct copy of which is attached, without exhibits, as Exhibit G. Counsel's affirmation showed that Sandy deposited approximately $50,000 of Estate assets, including over one hundred checks payable to Levon or the Estate, into her personal Bank of America account. (Ex. G, ¶10). The affirmation also set forth several unexplained checks and transfers from the Estate's accounts into Sandy's personal account totaling more than $200,000. (*Id.* at ¶11).

27. Following issuance of an Order to Show Cause and a hearing, the Surrogate removed Sandy as administrator and ordered her to file an accounting. A true and correct copy of the Order of June 11, 2025 is attached as Exhibit H. The deadline for Sandy to file the accounting has been postponed several times, and it is currently due on December 14, 2026, under an Order of the Surrogate on October 13, 2026, a true and correct copy of which is attached as Exhibit I.

**C. The 2025 Consents and the Intent to Settle**

28. On June 6, 2025—a few days after Sandy was served with Amy's Order to Show Cause seeking to compel Sandy to account for her alleged embezzlement from the Estate—Parillo, O'Brien, and Sandy signed a written shareholder consent that purported to remove Amy as a director of LHS (the "2025 Shareholder Consent"). Upon information and belief, Parillo exercised undue influence over Sandy in her extreme distress over the allegations against her in the Estate Proceeding and coerced her into signing the 2025 Shareholder Consent. Sandy also signed a second consent, as the Company's purported sole director, that claimed to remove Amy as President of LHS (the "2025 Board Consent," and together with the 2025 Shareholder Consent, the "2025 Consents"). True and correct copies of the 2025 Consents and an accompanying "notice" letter to Amy are attached as Exhibit J.

29. The 2025 Shareholder Consent purported to (a) remove Amy as a director "effective immediately;" (b) amend the Company's By-Laws to reduce the number of directors from two to one; and (c) engage an accountant to audit the Company's books and records. (Ex. J).

30. Amy did not sign the 2025 Shareholder Consent. No meeting of shareholders was called, noticed, or held. Amy first learned of the 2025 Shareholder Consent through a letter dated June 6, 2025, signed by Sandy as Director, that purported to give notice under BCL §615(c). (*Id.*).

31. Also on June 6, 2025, Sandy alone signed the 2025 Board Consent, titled "Actions by Written Consent in Lieu of Special Meeting by the Board of Directors of Levon Helm Studios, Inc." In it, Sandy described herself as purportedly "the sole member of the board of directors" of LHS and, invoking BCL §708, purported to remove Amy as President, to appoint herself as President, Secretary, and Treasurer, and to appoint O'Brien as Assistant Treasurer. Upon information and belief, the 2025 Board Consent was also executed by Sandy under undue influence

from Parillo. Amy did not sign the 2025 Board Consent and had no notice that Sandy was purporting to take action on behalf of LHS's board.

32. Nothing in the 2025 Consents identified any legitimate business reason for removing Amy from the leadership of LHS, and none existed. In fact, LHS admits in the Federal Complaint that the 2025 Consents were executed as a direct "response" to Amy's petition against Sandy in the Estate Proceeding. (Ex. F, ¶82). Upon information and belief, Parillo procured Sandy's signatures on the 2025 Consents by exploiting Sandy's fear of being held liable for stealing Estate assets and presenting the 2025 Consents as her only means of protecting herself. Upon information and belief, Sandy did not receive independent advice concerning the effect of the 2025 Consents or the procedural requirements that governed their execution.

33. The 2025 Consents, by purportedly removing Amy—the Company's President, a director, and 40% shareholder—were a step in Parillo's unlawful effort to seize control of LHS, knowing that Sandy, unlike Amy, was particularly susceptible to his pressure and influence.

34. Shortly after the 2025 Consents were executed, an attorney for Amy questioned their validity. As the Federal Complaint acknowledges, however, Amy continued to communicate with and oversee LHS staff. (Ex. F, ¶82).

35. Parillo's attempt to take over LHS was dealt another blow on September 15, 2025, when Sandy—represented by her own independent estate counsel—signed a Letter of Intent to Settle with Amy that was later filed with the Surrogate's Court (the "Intent to Settle"). Under it, Amy and Sandy agreed, among other things, to exchange mutual releases and to abstain from "bring[ing] any future lawsuits related to the estate, LHS or a related entity." A true and correct copy of the Intent to Settle is attached as Exhibit K. This expression of the intent of Sandy and Amy to reach a global settlement threatened Parillo's takeover scheme, which depended on

convincing Sandy that the only way she could escape the threat of liability for embezzlement in the Estate Proceeding was by removing Amy from her corporate governance positions at LHS.

**D. <u>The May 26, 2026 Written Consents</u>**

36. Upon information and belief, in the months after the Intent to Settle was executed, Parillo and O'Brien further inveigled themselves into Sandy's personal and business affairs in order to convince her not to finalize the Intent to Settle. These efforts culminated in late May and June 2026.

37. At that time, upon information and belief, Parillo exercised undue influence over Sandy to get her to sign a document titled "Actions by Written Consent by the Shareholders of Levon Helm Studios, Inc.," dated May 26, 2026 (the "2026 Shareholder Consent"), which Parillo and O'Brien also signed. The 2026 Shareholder Consent recited that Sandy was "currently serving as the sole member of the Board of Directors of the Company," and purported to remove Sandy as "sole director" and replace her with Parillo.

38. Like its predecessor in 2025, Amy did not sign the 2026 Shareholder Consent, and no shareholder meeting was called, noticed, or held.

39. Parillo also executed, as "the sole member of the board of directors [of LHS]," a document titled "Actions by Written Consent in Leiu [sic] of Special Meeting by the Board of Directors of Levon Helm Studios, Inc.," dated May 26, 2026 (the "2026 Board Consent," and together with the 2026 Shareholder Consent, the "2026 Consents"). True and correct copies of the 2026 Consents and the accompanying "notice" letter to Amy are attached as Exhibit L.

40. In the 2026 Board Consent, Parillo appointed himself President, Secretary, and Treasurer. In an apparent effort to ensure his complete control and block any participation by Amy, the Consent purported to grant Parillo authority, among other things, to hire attorneys, sign checks,

borrow money, and "institute litigation on behalf of the Company," and in a highly unusual provision, purported to remove "any individual other than Brian Parillo serving as an officer of the Company" and declare that "no one besides Brian Parillo or a person duly authorized to act on behalf of the Company shall have the authority to act behalf [sic] of the Company or to use or possess any of its assets."

41. Amy did not sign the 2026 Board Consent and had no notice that Parillo was purporting to take action on behalf of LHS's board. Amy was sent a letter, dated May 27, 2026 and signed by Parillo as "Director," that purported to notify her of the 2026 Consents.

42. Also on May 27, 2026, the law firm Brightpoint Law, LLP ("Brightpoint"), writing on behalf of LHS with a copy to "Brian Parillo, CEO," sent a letter to George Gilbert (a lawyer and a defendant in the Federal Action) informing him that Parillo "has the exclusive ability to manage the affairs and act on behalf of the Company" and that Brightpoint was the only law firm authorized to represent the Company. A true and correct copy of the May 27, 2026 letter (without exhibits) is attached as Exhibit M.

43. Faced with Parillo's takeover, four long-time staff members of the Company resigned from LHS, and two of them have been sued as defendants in the Federal Action.

**E. <u>Sandy Tells Amy She Was "Conned" and Tries to Undo Parillo's Takeover</u>**

44. On Thursday, May 28, 2026, Amy went to collect personal belongings from the Barn, which she and Sandy co-own as members of Levon's Barn LLC. The events that day are addressed in Amy's affirmation submitted to the Surrogate's Court, (Ex. A), from which the following information is taken.

45. When Sandy came out of the Barn to speak with Amy, Sandy appeared confused and upset. Sandy told Amy that Parillo's lawyers were telling her that Amy had stolen hundreds

of thousands of dollars from LHS and that she did not know what to believe. When Amy reminded Sandy that they both had relied on an accountant whom they trusted to prepare the Company's tax returns, Sandy responded, looking confused: "Well, they (Brian's lawyers) keep telling me numbers and they're shocking."

46. Parillo arrived and began following Sandy and Amy throughout the studio. He told Sandy not to speak to Amy without a lawyer and demanded that Amy leave the property, even though Sandy told him more than once that she wanted to speak with Amy alone. Parillo then called the police. When the police arrived, Sandy was upset to learn that Parillo had called them, saying: "My God, he called the police? This is ridiculous. This is going too far." The police took statements—including from Sandy, who stated that Parillo was "trying to take over the [C]ompany and obtain ownership"—and reported that "Parillo left" and "[t]he matter was mediated for the time being." A true and correct copy of the Woodstock Town Police Department's official report on the incident is attached as Exhibit N.

47. After Parillo left, Sandy expressed deep regret to Amy about what she had set in motion by electing Parillo as President of LHS, giving him access to the Company's bank accounts, and allowing him to take over the Company's operations from its long-time staff. Sandy began to cry and asked Amy to stay and help her "undo what [she] had done."

48. Thereafter, Sandy told Amy: "Brian asked me to give him my 40% of Levon Helm Studios. He said he had a plan to force you to buy the company back from him for $5 million dollars, and I'd be set for life." She continued: "I thought it was strange when they asked me for my 40%. I thought, 'they've conned me.' I'm so gullible, they're taking advantage of me. How do I undo this? I don't know why I keep doing this."

49. Looking at Amy with fear and confusion, Sandy said: "I don't know how to put a boundary in my head. [Brian and his lawyers] just keep getting in my head. I don't know what's wrong with me."

50. That same day, Sandy sent an email to Brightpoint, Parillo's lawyers and the Company's new corporate counsel, stating that she wished to withdraw her vote for Parillo as President of LHS. Parillo and his counsel disregarded it.

51. Amy is aware that Parillo's Federal Complaint tells a different story about the events of May 28, 2026. It asserts, among other things, that Amy spent hours "berating" Sandy, confined her at the Barn, and assaulted Parillo. Those allegations are untrue. As set forth in Amy's affirmation to the Surrogate's Court and in the contemporaneous police report (Exs. A, N), Amy did not coerce, confine, or intimidate Sandy; she went to the Barn to collect her belongings and, when Sandy expressed her distress, Amy tried to help her stepmother understand what Parillo had done. The allegations in the Federal Complaint are a litigation-driven attempt to recast Parillo's own exploitation of Sandy as misconduct by Amy.

**F. <u>Parillo Isolates Sandy and Tries to Take Her Vote</u>**

52. In the days that followed, Parillo exercised further undue influence to keep Sandy under his control. Upon information and belief, on June 1, 2026, Parillo and an associate (who has no role at LHS) spent the day with Sandy at the Barn. Parillo pressured Sandy to sign a "stock assignment[]" purporting to transfer the right to vote Sandy's shares in LHS to Parillo while, according to the Federal Complaint, supposedly "allow[ing]" Sandy "to keep all economic rights" thereto (the "Voting Assignment"). (Ex. F, ¶89). Parillo claims to have received a similar assignment of voting rights from O'Brien. (*Id.*) Parillo does not allege whether these assignments are revocable, or whether any consideration was given in exchange for their execution. There is

no indication that Sandy received independent legal advice concerning the Voting Assignment. Through these instruments, Parillo—the owner of 10% of LHS's shares—now claims to control 60% of the Company's voting power.

53. Copies of the Voting Assignment and the similar document executed by O'Brien have never been provided to Amy.

54. Parillo has stated in the Federal Complaint that the Voting Assignment was "especially important to Sandy, because of the recent pressure Amy applied to her to try and pressure her to rescind her vote to elect Brian as President of LHS," and that "[n]ow that Brian held the voting rights to Sandy's LHS shares, Amy returning to pressure her would have no legal effect on LHS." (Ex. F, ¶89). Elsewhere in the Federal Complaint, Parillo states that Sandy needs to be shielded from "attempts at coercion." (*Id.* ¶9). But rather than seek the appointment of a neutral guardian over Sandy (as Amy did in the Estate Proceeding), Parillo abused his control over Sandy to benefit himself and attack Amy. Put differently, four days after Sandy told Brightpoint that she wanted to withdraw her vote for Parillo, Parillo took steps to divest Sandy of that vote altogether, thus ensuring that Parillo would remain in control of LHS regardless of Sandy's wishes.

55. In this regard, Amy submitted the affirmation in the Estate Proceeding in support of the appointment of a guardian *ad litem* for Sandy. Amy described the events set forth above and raised her concern "about Sandy's ability to act rationally and protect herself from further manipulation" from Parillo and his attorneys, whom she alleged were "clearly engaging in what can only be described as financial exploitation and elder abuse." (Ex. A, ¶ 21).

56. In response to Amy's affirmation, the Surrogate's Court entered an Order Appointing Guardian *ad Litem* on July 10, 2026. (Ex. B). The Order recited that Sandy "is a

person under disability, to wit, [an] Incapacitated Person" and required the guardian *ad litem* to prepare a written report concerning Sandy's ability to participate in the Estate Proceeding. (*Id.*).

57. The guardian *ad litem* filed the written report on October 12, 2026. A true and correct copy of this report is attached as Exhibit O. In it, the guardian *ad litem* expressed his "concern[] that [Sandy] has retained the economic interest in her shares" of LHS, "while transferring the right to vote them," which "may affect her ability to participate in decisions concerning the [C]ompany even though she retains an economic stake in its value." (Ex. O, ¶17). Despite meeting with Sandy and speaking with her by telephone and email "on several occasions," (*id.* at ¶1), the guardian *ad litem* did "not yet understand what [Sandy] expected to gain" from the Voting Assignment, "why she chose to transfer voting rights to Mr. Parillo, or whether she fully appreciated the legal and practical consequences" of doing so. (*Id.* at ¶17). The guardian *ad litem* further explained that he "ha[d] not independently reviewed or determined the validity or effect" of the Voting Assignment, and recommended (i) that Sandy "receive a clear explanation of the transfer, its consequences, and any available options, including but not limited to avoiding the transfer," and (ii) that Sandy's "own reasons for entering into it should be explored directly and without pressure from interested parties." (*Id.* at ¶18).

58. Although the guardian *ad litem* did not recommend a finding that Sandy is unable to participate in the Estate Proceeding, he did express his "concerns that [Sandy] would benefit from clear, candid, and focused advice" concerning the matter—including the "risks, costs, and likely consequences of continued litigation" and "the available settlement options." (*Id.* ¶¶6, 7, 13). He recommended "that the Court refer the parties to mediation, or convene a settlement conference." (*Id.* ¶24).

### G. Parillo's Abuse and Weaponizing of His Purported Control over LHS

59. Since purporting to take over LHS, Parillo has tightened his grip over Sandy, and in breach of his fiduciary duties, deprived LHS of much-needed income, and weaponized the Company against Amy.

60. Shortly after taking over, Parillo changed the locks and took control of the security cameras at the Barn, where Sandy lives and which Amy co-owns. Through his counsel at Brightpoint, Parillo demanded on June 2, 2026, as a condition of allowing Amy to perform a previously scheduled June 6, 2026 concert at the Barn, that Amy not contact Sandy, not come onto the premises, and email all LHS employees instructing them that Parillo controlled LHS, among other things. When Amy did not respond to these demands before an arbitrary deadline, Parillo cancelled the June 6 concert and lied to the public by claiming the cancellation was due to a family emergency on Amy's part. Brightpoint attorney Zachary Bohlender emailed Amy threatening a lawsuit against her if she told anyone the true reason for the cancellation. A true and correct copy of this email is attached as Exhibit P.

61. Parillo's cancellation of the June 6 show for no legitimate reason deprived the Company of income the concert would have generated, and upon information and belief, Parillo has cancelled other scheduled concerts and deprived the Company of additional income. Upon information and belief, Parillo's counsel Bohlender caused the Company to send cease-and-desist letters to other promoters and venues who had booked Amy to perform. Moreover, when Parillo's lie about the reason for the June 6 cancellation was exposed in an online posting by the concert's opening act—who is Amy's ex-husband, Jay Collins—which stated that the show had been "cancelled by the new owners of the company," Bohlender sent Collins a cryptic and threatening

WhatsApp message stating: "You just sealed Amy's fate." True and correct copies of the online post and Bohlender's WhatsApp message are attached as Exhibits Q and R.

62. Bohlender made Parillo's vindictive motivations clear in a June 5, 2026 email to Amy's estate counsel, copying Parillo, which warned that "[w]e can make Amy radioactive" and reduce her "career as a touring musician" to "smoking ruins." A true and correct copy of Bohlender's June 5, 2026 email is attached as Exhibit S. Parillo also is financially motivated. As Sandy reported to Amy, Parillo convinced Sandy to sign the 2026 Consents by assuring her that "he had a plan to force [Amy] to buy the company back from him for $5 million" and Sandy would be "set for life." (Ex. A, ¶15).

63. Parillo's misuse of LHS resources was compounded on August 10, 2026, when he caused LHS, through Brightpoint, to carry out Bohlender's threat to sue Amy by filing the Federal Complaint. Although the Federal Action is nominally brought in the Company's name, Parillo authorized it, he directed Brightpoint to file it, and he purports to speak for LHS in prosecuting it, all without any lawful authorization. The Federal Complaint—a sixty-two-page document rife with misrepresentations—brings claims under federal and New York law against Amy and a number of former LHS employees and agents. Among other things, it accuses Amy of breaching and conspiring to breach fiduciary duties to LHS, infringing a trademark allegedly owned by LHS, and tortiously interfering with LHS's contracts.

64. The commencement and prosecution of the Federal Action were not authorized by the Company's lawfully constituted board of directors. Amy, who remains a director due to the invalidity of the 2025 and 2026 Consents, did not consent to any board action authorizing the Federal Action. The only purported authority for the Federal Action derives from the invalid 2026 Consents and Parillo's purported control of Sandy's vote through the invalid Voting Assignment.

65. Parillo has also used his purported control of LHS to appropriate Levon's name, image, and likeness without authorization from the Estate. Upon information and belief, Parillo created and is currently managing a series of social media accounts, each using the name, image, or likeness of Levon Helm. On October 15, 2026, counsel to the Public Administrator of the Estate served a cease-and-desist demand on Parillo "individually and on behalf of LHS," asserting that Parillo's conduct exposes the Company to liability under state and federal law. A true and correct copy of that letter is attached as Exhibit T. Parillo undertook this tortious conduct without lawful authorization and has exposed LHS to legal liability.

**H. <u>The Purported Consents and Voting Assignment Are Void</u>**

66. The corporate acts purportedly taken pursuant to the 2025 Consents and 2026 Consents are void. LHS's Certificate of Incorporation does not permit shareholders to act by written consent of fewer than all shareholders. Under BCL §615(a), absent such a provision, shareholders may not act without a meeting, except by written consent signed by the holders of all outstanding voting shares. Amy, who holds 40% of the shares, never signed any of the consents. No shareholder meeting was ever noticed or held. Because Amy was never lawfully removed as a director, the "sole director" consents signed first by Sandy in 2025 and then by Parillo in 2026 are void under BCL §708(b) and the Company's By-Laws, which require that any board action without a meeting must be approved in writing by all directors.

67. The Consents and the Voting Assignment are independently void because Parillo procured them through undue influence over a vulnerable person who lacked the ability to understand the nature and consequences of those documents. Sandy is in her mid-seventies. As alleged above, within days of signing the 2026 Consents, she told Amy that she had been "conned" by Parillo and confided that Parillo and his lawyers "just keep getting in my head. I don't know

what's wrong with me;" and "they're taking advantage of me." (Ex. A, ¶¶15-16). Shortly thereafter, the Surrogate's Court found that Sandy "is a person under disability" and ordered a guardian *ad litem*. (Ex. B). Moreover, Parillo admits that Sandy is highly vulnerable to influence. (*See above* ¶54; Ex. F, ¶¶9, 89).

**I. <u>Parillo's Continuing Abuse of His Control of LHS</u>**

68. Parillo has wasted the Company's assets by directing counsel to bring and prosecute the Federal Action and seeking to entrench himself in control of the Company. He has publicly tarnished the goodwill and community standing of LHS, the personal and professional reputation of Amy, and the legacy of Levon Helm. Unless restrained, Parillo will continue to exercise control over the Company's assets, accounts, and attorneys, and will attempt to use Sandy's purported Voting Assignment to ratify his unlawful acts and entrench himself further, all to the detriment of LHS and its other shareholders, including Sandy and Amy.

69. The harm to Amy and to LHS is immediate and cannot be remedied by money damages alone. Parillo is likely to attempt to further entrench himself by attempting to cure or ratify the legal defects in the 2025 and 2026 Consents. Although any such action would be invalid because the Voting Assignment is void, Parillo is likely to attempt to deprive Amy of her rights as a director, officer, and shareholder to participate in the governance of the Company. Furthermore, Parillo is likely to continue mismanaging the Company for his own benefit, wasting its assets, and destroying its goodwill. Reinstating the governance structure that existed before the 2025 Consents—with Amy and Sandy (if able) as LHS's directors and Amy as its President—is necessary to prevent that irreparable harm.

## DERIVATIVE AND DEMAND-FUTILITY ALLEGATIONS

70. Amy brings the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action derivatively on behalf of LHS pursuant to BCL §626. Amy also brings the First, Second, Third, Fourth, and Seventh Causes of Action as direct claims in her individual capacity.

71. Amy has continuously held 40% of LHS's issued and outstanding shares throughout the time of the actions and transactions complained of herein. Amy will fairly and adequately represent the interests of the Company in enforcing its rights.

72. Amy has not made a demand on LHS's board to commence this action because such a demand would be futile:

a. Defendant Brian Parillo claims to act on behalf of the Company as its sole director and officer. Parillo is also the principal wrongdoer and a defendant against whom the derivative claims are asserted. Parillo cannot impartially consider a demand that he sue himself, remove himself from his position as purported director and officer, and repay the Company for his own misconduct.

b. Parillo is personally interested in the challenged actions and transactions. He appointed himself sole director, sole officer, and the only person authorized to act for the Company, and he illegally obtained for himself the right to vote Sandy's shares.

c. The challenged actions and transactions—the purported removal of directors and officers contrary to the procedures required by law, the waste of corporate resources, and other actions as set forth in the foregoing allegations—were not, and could not have been, the product of a valid exercise of business judgment.

73. This action is not brought collusively to confer jurisdiction that the Court otherwise would lack.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment against Both Defendants – LHS Lacks Capacity to Bring the Federal Action)**

74. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

75. A justiciable controversy exists between Amy, on the one hand, and Parillo and LHS, on the other, concerning who lawfully constitutes the Company's board of directors and officers and whether Parillo had authority to cause LHS to commence and prosecute the Federal Action. A justiciable controversy also exists between LHS, on the one hand, and Parillo, on the other, concerning the same. The commencement and prosecution of the Federal Action directly harms Amy by forcing her to expend resources defending it, and harms LHS and its shareholders by virtue of the waste of resources required to commence and prosecute it, including because the claims raised therein serve only Parillo's own agenda and financial interest.

76. The 2025 Consents and the 2026 Consents are void because they did not comply with the BCL or the Company's Certificate of Incorporation.

77. Under BCL §615(a), shareholders may act without a meeting by written consent only if the consent is signed by the holders of all outstanding shares entitled to vote, unless the certificate of incorporation specifically permits action by the holders of fewer shares. LHS's Certificate of Incorporation contains no such provision. Amy, the holder of 40% of the outstanding shares, signed neither the 2025 Shareholder Consent nor the 2026 Shareholder Consent. Each is therefore void, including any purported removal of directors, appointment of Parillo, and amendment of the By-Laws.

78. Because Amy was never lawfully removed, she remained a director at all relevant times. Under BCL §708(b) and the Company's By-Laws, the board may act without a meeting only by the written consent of all directors. Amy, a board member, signed neither the 2025 Board

Consent nor the 2026 Board Consent. Each is therefore void, including the purported removal of Amy as President and appointment of Sandy and Parillo as officers.

79. Parillo, who was never lawfully elected a director, could not act as the "sole member" of the board, and his purported appointment in 2026 of himself as President, Secretary, and Treasurer is void under BCL §715 and the By-Laws.

80. Because Parillo was never lawfully appointed as a director or officer of LHS, he had no authority to cause LHS to retain counsel, commence the Federal Action, or prosecute it.

81. Independently and in the alternative, the 2025 Consents and 2026 Consents are void because Parillo procured Sandy's signature through mistake or undue influence. Parillo occupied a position of trust, confidence, and influence over Sandy, who was elderly, frightened, isolated, dependent on those around her for financial support, and unable to resist Parillo's influence; he exerted this influence through misrepresentation, pressure, and isolation, including by telling Sandy "he had a plan to force [Amy] to buy the company back from him for $5 million dollars, and [Sandy would] be set for life" (Ex. A, ¶15); and he did so to obtain control of the Company for himself, as Sandy recognized when she told Amy that she had been "conned." (*Id.*).

82. Independently and in the alternative, the 2026 Consents are void because Sandy was unable to understand the nature and consequences of those instruments at the time she signed them, as evidenced by, among other things, her contemporaneous confusion and her statements that she did not know "what's wrong with me" and could not "put a boundary in [her] head." (Ex. A, ¶16).

83. Amy, individually and derivatively on behalf of LHS, is entitled to a judgment pursuant to CPLR §3001 declaring that (a) the 2025 Consents and the 2026 Consents are null, void, and of no effect; (b) Parillo is not, and has never been, a director or officer of LHS; (c) Parillo

had no authority to cause LHS to commence or prosecute the Federal Action, and the Federal Action was not authorized by LHS; and (d) the Company's lawful board of directors consists of Amy and Sandy.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment against Both Defendants – Invalid Voting Assignment)**

84. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

85. A justiciable controversy exists between Amy, on the one hand, and Parillo and LHS, on the other, concerning whether Parillo may vote Sandy's shares of LHS pursuant to the Voting Assignment. A justiciable controversy also exists between LHS, on the one hand, and Parillo, on the other, concerning the same. Parillo's asserted control of the voting power of Sandy's shares directly harms Amy by impairing the value and voting power of Amy's 40% shareholding and her rights as a shareholder and director. Parillo's claim to control Sandy's voting power also harms LHS by entrenching his improper claim to hold the Company's "sole" director position, and interferes with LHS's shareholders' ability to remove him through the standard mechanisms available under the BCL, the Certificate of Incorporation, and the By-Laws.

86. The Voting Assignment is void because Parillo procured it through mistake or undue influence. Parillo obtained the Voting Assignment four days after Sandy told the Company's counsel that she wished to withdraw her support for him. He obtained it from a vulnerable, frightened woman in her mid-seventies, with whom he had a relationship of trust, confidence, and influence and who was unable to resist his influence. He did so because he wanted to preclude Sandy's ability to vote, and so that he could purport to control the Company.

87. Independently and in the alternative, the Voting Assignment is void because Sandy lacked the ability to understand the nature and consequences of executing that document, as

evidenced by the guardian *ad litem*'s concern about "whether she fully appreciated the legal and practical consequences" of the instrument. (Ex. O, ¶17).

88. Further and in the alternative, Parillo has not alleged that the Voting Assignment is irrevocable or that it was supported by sufficient valid consideration.

89. Amy, individually and derivatively on behalf of LHS, is entitled to a judgment pursuant to CPLR §3001 declaring that the Voting Assignment is null, void, and of no effect, and that Parillo has no right to vote, or to act by written consent with respect to, the shares of LHS held of record by Sandy.

**THIRD CAUSE OF ACTION**
**(Equitable Relief for Improper Removal against Both Defendants)**

90. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

91. Amy was serving as a duly elected director and President of LHS prior to the execution of the 2025 Consents.

92. The purported removal of Amy as a director by the 2025 Shareholder Consent did not comply with BCL §§615 and 706, the Certificate of Incorporation, or the By-Laws, because it was neither approved by a vote of shareholders at a duly noticed meeting nor approved by the written consent of the holders of all outstanding shares.

93. The purported removal of Amy as President by the 2025 Board Consent, and the purported removal of "any individual other than Brian Parillo serving as an officer of the Company" by the 2026 Board Consent, did not comply with BCL §§708 and 716 or the By-Laws, because neither was approved by the Company's lawfully constituted board at a meeting or by the unanimous written consent of all directors.

94. Independently and in the alternative, the purported removals are void because Parillo procured them through mistake or undue influence over Sandy or while Sandy lacked the ability to understand the nature and consequences of those actions, as alleged above.

95. As a result, Amy remains a director and the President of LHS, but she has been excluded by Parillo from the exercise of those offices to her and LHS's detriment.

96. Amy and LHS have no adequate remedy at law.

97. Amy, individually and derivatively on behalf of LHS, is entitled to a judgment declaring that she remains a director and the President of LHS, reinstating her to those offices, enjoining Defendants from interfering with her exercise of those offices, and awarding damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Removal of Director and Officer under BCL §§ 706(d) and 716(c) against Parillo)**

98. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

99. BCL §706(d) authorizes the holders of 10% of the outstanding shares of a corporation to bring an action to procure a judgment removing a director for cause, and empowers the Court to bar the director from re-election for a period fixed by the Court. BCL §716(c) authorizes the holders of 10% of the outstanding shares to bring an action to procure a judgment removing an officer for cause.

100. Amy holds 40% of the outstanding shares of LHS.

101. To the extent Parillo is found to hold any position as a director or officer of LHS, good cause exists to remove him from each such position because, among other things, he (a) obtained his purported offices through invalid corporate acts in violation of the BCL, the Certificate of Incorporation, and the By-Laws; (b) procured Sandy's signatures on the 2025 and

2026 Consents and the Voting Assignment through undue influence over a vulnerable shareholder; (c) appointed himself to corporate offices and declared that no one else could act for the Company in bad faith; (d) disregarded Sandy's express request to withdraw her vote for him; (e) caused LHS to commence and prosecute the Federal Action without the authorization of a lawful board, wasting corporate resources and forcing Amy to expend resources in her defense; (f) used his purported control for his own financial benefit by pursuing a plan to coerce Amy to pay for the return of the Company; (g) harmed LHS's goodwill and community reputation; and (h) caused LHS to make unauthorized commercial use of Levon's name, image, and likeness, thereby exposing the Company to liability.

102. Amy, individually and derivatively on behalf of LHS, is entitled to a judgment removing Parillo, for cause, as a director and as President, Secretary, Treasurer, and any other office of LHS, and barring him from re-election or reappointment to any such office for a period to be fixed by the Court.

**FIFTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty against Parillo)**

103. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

104. By purporting to act as the sole director and sole officer of LHS and exercising control over its affairs, assets, accounts, and litigation, Parillo assumed and owed LHS and its shareholders fiduciary duties of loyalty, care, and good faith, including the duties imposed by BCL §§715 and 717 and by the common law.

105. Parillo breached those duties by, among other things, (a) procuring control of LHS through undue influence over Sandy and through invalid corporate acts; (b) usurping the authority of the Company's lawful board and officers; (c) causing LHS to retain counsel and to commence

and prosecute the Federal Action without lawful authorization and for his own self-interested purposes; (d) wasting assets of LHS in furtherance of his effort to obtain and entrench his control; (e) causing LHS to forgo revenue from performances at the Barn; (f) using his purported control for his own financial benefit by pursuing a plan to coerce Amy to pay for the return of the Company; (g) harming LHS's goodwill and community reputation; and (h) causing LHS to make unauthorized commercial use of Levon's name, image, and likeness, thereby exposing the Company to liability.

106. Parillo's conduct was undertaken in bad faith and for his personal benefit, and it is not protected by the business judgment rule or by the Certificate of Incorporation.

107. As a direct and proximate result of Parillo's breaches, LHS has suffered and will continue to suffer damages in an amount to be determined at trial.

108. Pursuant to BCL §720, Amy, derivatively on behalf of LHS, is entitled to a judgment awarding LHS damages in an amount to be determined at trial, compelling Parillo to account for his official conduct in the management and disposition of the Company's assets, ordering Parillo to pay to LHS the value of all corporate funds and assets he caused to be expended or lost through his breaches, setting aside any unlawful conveyance, assignment, or transfer of corporate assets made by him, and enjoining further breaches.

**SIXTH CAUSE OF ACTION**
**(Equitable Accounting against Parillo)**

109. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

110. Since at least May 26, 2026, Parillo has purported to act as the sole director and sole officer of LHS and to take exclusive control of the Company's assets, bank accounts, books and records, revenues, and operations. As a purported fiduciary in sole possession and control of

the Company's property, Parillo owes LHS a duty to account for his stewardship of that property, including by accounting for LHS's loss of revenue from cancelled concerts and failure to book additional shows and for wasting LHS assets in connection with the Federal Action and otherwise.

111. Amy, derivatively on behalf of LHS, is entitled to a judgment compelling Parillo to render a full and accurate accounting of his management and disposition of the Company's assets, funds, and property from May 26, 2026 to the time such accounting is delivered, and to pay over and restore to LHS all amounts determined to be due to the Company upon that accounting.

**SEVENTH CAUSE OF ACTION**
**(Injunctive Relief against Both Defendants)**

112. Plaintiff repeats and re-alleges the foregoing allegations with the same force and effect as if fully set forth herein.

113. Under New York law, an injunction is warranted where, following a determination on the merits, the moving party demonstrates the absence of an adequate remedy at law and that the equities favor permanent injunctive relief. A party is entitled to a preliminary injunction upon a showing of (a) a likelihood of success on the merits, (b) the prospect of irreparable injury absent the requested relief, and (c) a balance of the equities in the moving party's favor. Amy, individually and derivatively on behalf of LHS, satisfies these requirements.

114. Amy and LHS are likely to succeed on the merits. As alleged above, the 2025 Consents, the 2026 Consents, and the Voting Assignment are void because they did not comply with the BCL or the Certificate of Incorporation and because they were procured through Parillo's undue influence over Sandy or when she was unable to understand the nature and consequences of those documents. Because Amy was never lawfully removed, she remains a director and the President of LHS, and Parillo was never lawfully elected a director or appointed an officer. Parillo

therefore lacks authority to act for LHS, including the authority to have caused LHS to commence or prosecute the Federal Action.

115. Amy and LHS will suffer irreparable injury absent injunctive relief. Parillo's continued exercise of unauthorized control deprives Amy of her rights as a director, officer, and 40% shareholder to participate in the governance of the Company—rights whose loss cannot be adequately measured or compensated in money damages. Unless restrained, Parillo will continue to hold himself out as the Company's sole director and officer, continue to cause LHS to waste its limited assets prosecuting the Federal Action that no lawful board authorized and otherwise, and attempt to use Sandy's purported vote to call a meeting or execute further written consents in order to ratify or entrench the acts challenged in this Complaint. Each of these harms threatens the governance and assets of LHS in a manner that a later award of damages could not undo.

116. The balance of the equities favors Amy and LHS. The requested relief restores the state of affairs that existed before the void 2025 and 2026 Consents—with Amy and Sandy as the Company's directors and Amy as its President—while this Court determines who lawfully controls LHS. Parillo, by contrast, would suffer no cognizable harm from being enjoined from exercising powers he never lawfully possessed or from wasting the Company's assets.

117. Amy and LHS have no adequate remedy at law, and the threatened injuries are of a continuing nature that will require multiple actions to redress if injunctive relief is not granted.

118. Amy, individually and derivatively on behalf of LHS, is entitled to preliminary and permanent injunctive relief enjoining Parillo and all persons acting in concert with him from (a) holding Parillo out as, or exercising the powers of, a director or officer of LHS; (b) voting, or executing any written consent with respect to, the shares of LHS held of record by Sandy; (c) calling or holding any meeting of shareholders or directors of LHS, or soliciting or executing any

written consent, for the purpose of ratifying any of the acts challenged in this Complaint or electing or removing any director or officer; and (d) expending, transferring, or encumbering any funds or assets of LHS other than in the ordinary course of business, together with such further injunctive relief as is necessary to give effect to the relief sought in the other Causes of Action and to restore and preserve the Company's lawful governance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amy Helm respectfully requests that the Court enter judgment in her favor, individually and derivatively on behalf of LHS, and against Defendants as follows:

A. On the First Cause of Action, a judgment declaring that (i) the 2025 Consents and the 2026 Consents are null, void, and of no effect; (ii) Brian Parillo is not, and has never been, a director or officer of LHS; (iii) Parillo had no authority to cause LHS to retain counsel or to commence or prosecute the Federal Action, and the Federal Action was not authorized by LHS; and (iv) the lawful board of directors of LHS consists of Amy Helm and Sandra Helm;

B. On the Second Cause of Action, a judgment declaring that the Voting Assignment is null, void, and of no effect, and that Brian Parillo has no right to vote, or to act by written consent with respect to, the shares of LHS held of record by Sandra Helm;

C. On the Third Cause of Action, a judgment declaring that Amy Helm remains a director and the President of LHS; reinstating her to those offices; enjoining Defendants from interfering with her exercise of those offices; and awarding her damages in an amount to be determined at trial;

D. On the Fourth Cause of Action, a judgment removing Brian Parillo, for cause, as a director and as President, Secretary, Treasurer, and any other office of LHS, and barring him from re-election or reappointment to any such office for a period fixed by the Court;

E. On the Fifth Cause of Action, a judgment in favor of LHS and against Brian Parillo (i) awarding LHS damages in an amount to be determined at trial; (ii) compelling Parillo to account for his official conduct in the management and disposition of LHS's assets; (iii) ordering Parillo to pay to LHS the value of all corporate funds and assets he caused to be expended or lost through his breaches; (iv) setting aside any unlawful conveyance, assignment, or transfer of corporate assets made by him; and (v) enjoining further breaches;

F. On the Sixth Cause of Action, a judgment compelling Brian Parillo to render a full and accurate accounting to LHS of his management and disposition of the Company's assets, funds, and property from May 26, 2026 to the time such accounting is delivered, and to pay over and restore to LHS all amounts determined to be due upon that accounting;

G. On the Seventh Cause of Action, preliminary and permanent injunctive relief enjoining Brian Parillo and all persons acting in concert with him, from (a) holding Parillo out as, or exercising the powers of, a director or officer of LHS; (b) voting, or executing any written consent with respect to, the shares of LHS held of record by Sandra Helm; (c) calling or holding any meeting of shareholders or directors of LHS, or soliciting or executing any written consent, for the purpose of ratifying any of the acts challenged in this Complaint or electing or removing any director or officer; and (d) expending, transferring, or encumbering any funds or assets of LHS other than in the ordinary course of business, together with such further injunctive relief as is necessary to give effect to the relief sought in the other Causes of Action and to restore and preserve the Company's lawful governance;

H. Pre-judgment and post-judgment interest to the fullest extent permitted by law;

I. Attorneys' fees to the fullest extent permitted under law or equity, including, pursuant to BCL §626(e), an award to Amy Helm of her reasonable expenses, including attorneys' fees, incurred in prosecuting the derivative claims;

J. An award of the costs and disbursements of this action; and

K. Such other relief as the Court may deem just and proper.

Dated: October 16, 2026
Albany, New York

Respectfully submitted,

*/s/ David A. Barrett*

**BOIES SCHILLER FLEXNER LLP**

George F. Carpinello
30 South Pearl Street
Albany, NY 12207
Phone: (518) 434-0600
gcarpinello@bsfllp.com

David A. Barrett
Alexander Geisel
55 Hudson Yards
New York, NY 10001
Phone: (212) 446-2300
dbarrett@bsfllp.com
ageisel@bsfllp.com

*Attorneys for Plaintiff Amy Helm*